**IBJ SCHRODER BANK &
TRUST COMPANY, as
Trustee, Plaintiff,**

**and**

**The Employees' Retirement System
of Alabama, et al., Plaintiffs–
Intervenors,**

**v.**

**The RESOLUTION TRUST CORPORA-
TION as Conservator for Franklin Sav-
ings Association, Defendant.**

**No. 90 Civ. 2736 (PNL).**

United States District Court,
S.D. New York.

Oct. 13, 1992.

As Amended Oct. 15, 1992.

Coudert Bros., New York City (Elinor R. Hoffman, Carolyn T. Ellis, W. Warren Scott, III, Paul S. Spivack, of counsel), Julie D. Fay, Asst. Gen. Counsel, IBJ Schroder Bank & Trust Co., New York City, for plaintiff.

Gibson, Dunn & Crutcher, New York City, Wesley G. Howell, Jr., Cantwell F. Muckenfuss, III (Mitchell A. Karlan, Robert F. Serio, of counsel), for plaintiffs-intervenors.

Hopkins & Sutter, Chicago, Ill. (Glen H. Kanwit, David B. Goroff, Claudette P. Miller, of counsel), Dewey, Ballantine, New York City (Jonathan W. Miller, Robin D. Adelstein, of counsel), for defendant and third-party plaintiff.

## OPINION AND ORDER

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEVAL, District Judge.

This case challenges the repudiation by the Resolution Trust Fund Corporation ("RTC"), as conservator of Franklin Savings Association ("Franklin"), of an indenture and bonds issued thereunder by Franklin. Plaintiff IBJ Schroder is the indenture trustee (the "Trustee") for the bondholders. The Trustee, joined by plaintiff-intervenor-bondholders (the "Bondholders"),[1] allege that (1) the RTC's repudiation of the indenture and the bonds is void as inconsistent with the standards of the governing statute, and unauthorized by RTC, (2) repudiation violates the Fifth Amendment substantive due process, procedural due process and takings clauses, and (3) in the event that the indenture and the bonds were lawfully repudiated, the damages to which the Bondholders are entitled differs from that offered by RTC. The Trustee also seeks an award of fees and expenses due under the indenture, including counsel fees incurred in this litigation.

Initially, the parties made cross-motions for summary judgment. The parties then withdrew the motions for summary judgment and instead stipulated to the submission of a written record for final trial on the merits.

### Background

On December 1, 1984, pursuant to a bond indenture (the "Indenture") between Franklin and Schroder as trustee for the bondholders, Franklin issued a series of bonds in the aggregate principal amount due on maturity of $2.9 billion (the "Bonds"). The Bonds are zero coupon bonds. This means that the issuer does not pay interest at any time prior to maturity; the only payment made by the issuer is the payment at maturity of the principal amount; thus the interest obligation incurred by the issuer is a function of the discount from face amount at which the Bonds were initially sold. When this discount is factored by the period of time from subscription to maturity, it can be expressed in terms of "yield-to-maturity." The payment of the principal amount at maturity will represent the reimbursement of the amount borrowed through the subscription at the time of issuance, plus a single payment representing all interest obligation accrued through the life of the Bonds.

The Bonds were issued in three series with terms of 30, 35, and 40 years, and thus come due on December 12, 2014, December 12, 2019 and December 12, 2024. The yield to maturity for these three maturity dates based on the subscription prices is respectively 11.75%, 11.375% and 11%.

---

1. The Trustee and the Bondholders are sometimes referred to collectively as "Plaintiffs."

Since the initial offering, the Bonds have been traded in the secondary markets. Among the holders of the Bonds, some purchased at the initial offering and some purchased in the secondary bond market thereafter at whatever prices prevailed from time to time. For a purchaser in the secondary bond market who buys at any point during the life of the bond, his interest expectation is a function of the difference between the price at which the purchase is made and the expected payment of stated value at maturity, factored by the period of time between his purchase and maturity.

The intervening Bondholders are state pension funds, insurance companies, and investment advisors. They own in the aggregate over 70% of the Bonds. They purchased their bonds in open secondary market transactions rather than at the initial offering.

Pursuant to the Indenture, the Bonds are secured by collateral furnished to the Trustee by Franklin consisting of cash and certificates issued by Federal Home Loan Mortgage Corporation, the Federal National Mortgage Corporation and the Government National Mortgage Association (the "Eligible Collateral"). The Indenture provides that the Trustee holds a first perfected security interest in the Eligible Collateral, for the benefit of all bondholders, in order to secure the payment of the Bonds at maturity. The Trustee also holds a junior security interest in the Eligible Collateral to secure payment for its services.

Because the value of the Eligible Collateral varies with the rise and fall of interest rates, the Trustee is required by the Indenture to value the Eligible Collateral each week to ensure that it is at least equal to the "Required Collateral Coverage." "Required Collateral Coverage" is defined as an amount of Eligible Collateral such that the sum of the market value of the Eligible Collateral (discounted by approximately 30%) equals the "Collateral Base." [2] The "Collateral Base" is defined as the purchase price of "Eligible Zero Coupon Securities" sufficient to pay the principal amount of the outstanding bonds at their respective maturities. "Eligible Zero Coupon Securities" are defined as U.S. Treasury securities and similar obligations of agencies and instrumentalities of the United States.

The Indenture specifies remedies designed to guarantee that the Bonds will be paid in full at their maturities even if the financial status of Franklin deteriorates. Among these are the remedies specified in Section 604 of the Indenture. The Trustee pursues the Section 604 remedies upon the happening of certain triggering events such as Franklin's failure to demonstrate its financial health in regulatory filings with the United States Office of Thrift Supervision ("OTS").[3] If Franklin submits a report to OTS disclosing that it fails to meet regulatory net worth requirements, the Trustee is obligated to liquidate the Eligible Collateral and to purchase Eligible Zero Coupon Securities in an amount sufficient to pay the principal amount of the outstanding bonds at their respective maturities. If after the expiration of 90 days Franklin fails to submit another regulatory

---

**2.** The market value of the Eligible Collateral is discounted to ensure that the Bonds are always over-collateralized.

**3.** Similar remedies are specified in Sections 1101 and 1102 of the Indenture with respect to "Events of Default" prior to maturity, such as Franklin being placed into conservatorship or receivership. Although Franklin was put into conservatorship, default and concomitant remedies have not been put at issue here by the Trustee or RTC because (1) events of default give the Trustee some discretion about how to proceed (whereas the filing of a bad report with OTS does not); (2) if the remedial provisions are triggered by a default, the conservator may ask the Trustee not to pursue the remedial provisions, (whereas no similar right is given to the conservator in the instance where a bad report has been filed with OTS). In the instant case, RTC as conservator specifically instructed the Trustee to refrain from pursuing the remedies available in the event of a default. *See infra.*

Intervenors, however, contend that the Trustee is obligated to sell the Eligible Collateral and defease the Bonds under the remedies triggered by Events of Default. Whether Intervenors are correct in this contention is academic because all parties agree that if the Indenture is in effect, events have occurred which would trigger the remedial provisions.

report to OTS stating that it is in compliance with regulatory capital requirements the Trustee is obligated to "defease" the Bonds. To effectuate defeasance, the Eligible Zero Coupon Securities are transferred to Defeasance Trusts held by the Trustee for the benefit of the Bondholders. Simultaneously, all substantial rights and obligations of Franklin under the Bonds and the Indenture terminate.

On February 16, 1990, OTS effectively terminated Franklin's status as a private institution by appointing RTC as Conservator of Franklin. Although the appointment of a conservator is an event constituting a default under the Indenture, the Indenture provides that the Trustee shall not pursue remedies available in the event of a default if that remedy has been objected to in writing by the conservator. By letter, RTC specifically instructed the Trustee not to pursue any remedies available to the Trustee under the Indenture in the event of a default (such as the appointment of a conservator).

In the letter, the RTC also took the position that it had the right as conservator to object to any exercise by the Trustee of the Section 604 collateral exchange and defeasance provisions that would be in effect should Franklin report its failure to meet minimum regulatory capital requirements to OTS. Accordingly, RTC advised the Trustee that it objected to the Trustee exercising Section 604 rights in the event that the conservator submitted regulatory reports to the OTS evidencing Franklin's failure to meet minimum capital requirements. RTC also advised the Trustee that the RTC would hold the Trustee strictly liable for any losses or damages incurred by Trustee as a result of the Trustee for taking any action objected to by RTC.

Among the powers available to the RTC under the FIRREA statute is the power to repudiate or disaffirm contracts of an institution under receivership or conservatorship. 12 U.S.C. § 1821(e)(1). From the time of its appointment as conservator, the RTC entertained the prospect of repudiating the Bonds. The RTC believed that by repudiating the Bonds it could save very large amounts (approximately $200 million) for the institution and could immediately obtain from the Trustee large amounts otherwise required to be held by the Trustee as Eligible Collateral securing the performance of the Bonds. The RTC decided, however, to delay repudiation primarily because of a lawsuit challenging the lawfulness of the conservatorship; the RTC reasoned that if its conservatorship were terminated by a court and the institution were returned to its powers, prior repudiation could bring the owners gigantic windfall profits resulting from the disaffirmance.

Several times during February and early March of 1990, RTC conferred with certain Bondholders regarding the future of the Bonds and the Indenture, but the parties reached no resolution. On March 6, 1990, RTC and the Trustee entered into a Standstill Agreement under which, among other things, RTC agreed that it would not demand the return of the Eligible Collateral without giving the Trustee 15 day prior written notice. RTC further agreed that it would not disaffirm or repudiate the Bonds or Indenture without giving 10 days prior written notice to the Trustee.

On April 10, 1990, Franklin, through its conservator the RTC, filed a Form 8–K with the OTS disclosing that it was not in compliance with the regulatory minimum capital requirements promulgated by the OTS pursuant to FIRREA. By the terms of the Indenture, this event triggered the Trustee's obligation to liquidate the Eligible Collateral and purchase Eligible Zero Coupon Securities pursuant to Section 604 of the Indenture.[4]

On April 10, 1990, the RTC announced a Statement of Policy concerning the repudiation of collateralized borrowings of institutions that had come under its conservatorship. The Statement announced that repudiations would occur within 60 days after the RTC's appointment, failing which the

4. Similarly, RTC's failure to submit an additional report to OTS within 90 days indicating Franklin's compliance with minimum regulatory capital requirements triggered the Trustees obligation to defease the Bonds and establish the Defeasance Trusts.

terms of the contract would be enforceable throughout the term of the receivership. As to damages payable by the RTC upon repudiation, the Statement announced that they would be limited to principal owed plus contract rate of interest, or (in the case of zero coupon bonds) "accreted interest" to the date of redemption.

On May 30, 1990, the RTC notified the Trustee that RTC intended to repudiate and disaffirm the Indenture and the Bonds on June 9, 1990, and to demand the return of the Eligible Collateral on or after June 14, 1990. The RTC reserved the right to change its mind.

On June 8, 1990, the Trustee received notice from the RTC that the RTC had disaffirmed and repudiated the Bonds and the Indenture pursuant to 12 U.S.C. § 1821(e)(1). The Trustee was directed to refrain from taking any action pursuant to the remedial provisions of the Indenture.

On July 25, 1990, RTC issued a payment notice establishing August 8 as the payment day for the Bonds. The notice stated that no additional increment of accrued value would be recognized after the payment date.

On December 14, 1990, counsel for RTC received a letter dated December 11, 1990 from the Trustee stating that the Trustee had withdrawn $630,000 in funds from Eligible Collateral held by the Trustee in order to pay fees and expenses purportedly incurred under the Indenture. RTC moved for a preliminary injunction requiring the Trustee to return those funds. The motion was denied.

### Issues of Law

#### Overview

The statutory law governing the dispute is contained in Section 212(e) of FIRREA, codified at 12 U.S.C. § 1821(e), which defines the rights and obligations of the RTC in its capacity as conservator or receiver for a financial institution, with respect to contracts entered into by the institution prior to the appointment of the conservator or receiver.

The RTC's right of repudiation is established by § 1821(e)(1), which provides that the RTC, as conservator or receiver for an insolvent institution,

> may disaffirm or repudiate any contract or lease—(A) to which such institution is a party; (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

12 U.S.C. § 1821(e)(1). Second, § 1821(e)(3) provides that RTC's liability for repudiating a contract pursuant to § 1821(e)(1),

> (A) ... shall be (i) limited to actual direct compensatory damages; and (ii) determined as of (I) the date of the appointment of the conservator or receiver; or (II) in the case of [qualified financial contracts] the date of the disaffirmance or repudiation of such contract or agreement.
>
> (B) For the purposes of subparagraph (A), the term "actual direct compensatory damages" does not include (i) punitive or exemplary damages; (ii) damages for lost profits or opportunity; or (iii) damages for pain and suffering.

12 U.S.C. § 1821(e)(3). Finally, § 1821(e)(11) of FIRREA provides that as regards "security interests,"

> No provision of this subsection shall be construed as permitting the avoidance of any legally enforceable or perfected security interest in any of the assets of any depository institution except where such interest is taken in contemplation of the institution's insolvency or with the intent of hinder, delay, or defraud the institution or the creditors of such institution.

12 U.S.C. § 1821(e)(11).

Several questions arise under those statutes:

Plaintiffs first contest the lawfulness of the RTC's repudiation on several grounds. Plaintiffs assert that the RTC did not determine, in accordance with the preconditions required by § 1821(e)(1)(B) and (C),

that the performance of the Indenture contract would be "burdensome" to the institution, or that repudiation "[would] promote the orderly administration of the institution's affairs." In addition, plaintiffs question whether the performance was in fact burdensome.

Further, plaintiffs contest whether prohibition of § 1821(e)(11) against "the avoidance of any ... security interest in any of the assets of the ... institution" prohibits the repudiation of these secured Bonds.

Finally, in the event it is determined the RTC did lawfully repudiate, the parties dispute the proper computation of "actual direct compensatory damages ... not includ[ing] ... damages for lost profits or opportunity," as provided by § 1821(e)(3).

\* \* \*

The initial challenge focuses on the lawfulness of the RTC's exercise of its power of repudiation. First, the Trustee and Bondholders contend that the RTC repudiated without having made the determinations required by the statute: that the performance of the Bonds' obligations would be "burdensome" and that repudiation would "promote the orderly administration of the institution's affairs." Second, they contend that, even if these determinations were made, it was an abuse of discretion on RTC's part to so determine. Third, they content the repudiation was void because it was not made within a reasonable time, as required by the FIRREA statute. Fourth, they contend the repudiation was void because the RTC official who purported to take the action lacked authority to take such action on the RTC's behalf.

█ 1. *Whether the RTC made the required determinations.* As to the first challenge, I find that the RTC has satisfactorily demonstrated that it made the required determinations. The repudiation decision was made on June 8, 1990 by William Roelle, the RTC's Director of Resolutions and Operations, after consultation with in-house counsel Michael Tucci. The decision was provoked by a Memorandum addressed to Roelle and Tucci on May 24, 1990, by John L. Carr, Managing Agent, and L. Stephen Garlow, Managing Attorney of the

Franklin. This memorandum warned that in order to comply with the April 10 Policy Statement, providing that the RTC would make its repudiation decisions within 60 days, the repudiation decision needed to be made by June 8. The memorandum went on to argue in eight single spaced typewritten pages that the Bonds were burdensome to the institution and that their repudiation would promote the orderly administration of Franklin's affairs. In general, the hypothesis of the memorandum was that repudiation would permit RTC to liquidate the Bonds at accreted value and recapture some $180 million in collateral being held by the Trustee as security for full performance. Tucci discussed this memorandum with Roelle. Tucci knew on the basis of prior discussions with Roelle that Roelle was familiar with the issues raised by the Carr memorandum. In fact, repudiation of the Franklin Bonds had been under consideration ever since RTC had assumed the conservatorship in February, and delayed, as noted above, primarily to avoid the risk of creating windfall profits for Franklin's stockholders if the conservatorship were terminated by a court. Roelle announced the repudiation on June 8, the last possible day.

No written memorandum was made of Roelle's determination that the Bonds were burdensome and that their repudiation would promote orderly administration. What's more, the Bondholders point out, Roelle's deposition and an earlier memo that he authored could support the conclusion that Roelle believed *burdensomeness* was the only required determination. They argue accordingly that Roelle never considered the question of promoting the orderly administration of the institution's affairs. I do not accept the Bondholders' argument. Although it would certainly be a more prudent and preferable procedure for the RTC to memorialize such determinations and actions by a formal written statement asserting that the required considerations had been met, the issuance of such a statement of the determinations made is not a requirement of law. Given that Carr's memorandum to Roelle advocating repudiation

expressly discussed the required statutory points and that Tucci thereafter discussed the question with Roelle, who in any event was familiar with the issue based on earlier discussion, I cannot accept the Bondholders' argument that Roelle made his decision to repudiate without making the necessary determinations on burdensomeness and on the promotion of the orderly administration of the Franklin's affairs.

■ 2. *Whether repudiation was arbitrary and capricious.* Nor do I accept the Bondholders' contention that the repudiation decision was void as arbitrary and capricious because it was not based on a thorough study of the alternatives or a correct understanding of the legal consequences. The Bondholders assert that the RTC was acting on a mistaken understanding of the law in its assumption that upon repudiation it could redeem at accreted value. They point out in addition that the RTC failed to make a thorough study comparing the consequences of defeasance by the Trustee with repudiation by the RTC. It may be, as the Bondholders contend, that the RTC was acting on an incorrect understanding of the legal consequences of repudiation. But it does not follow that the RTC's action was void for abuse of discretion. The statute makes a point of according wide discretionary authority to the RTC in its assessment of burdensomeness and the promotion of orderly administration. I find that the RTC acted lawfully, within that discretion, even if it should turn out that the determinations were based on an incorrect perception of the legal consequences of the act.

■ 3. *Whether repudiation was untimely.* I also reject the Bondholders' contention that the act of repudiation was untimely under the FIRREA statute. Under Section 1821(e)(2) repudiation must be done "within a reasonable period." Construing this restriction, the RTC issued a Policy Statement on April 10, 1990, that repudiations would be done within 60 days of the RTC's appointment. In this case, the repudiation did not occur for nearly four months after RTC's appointment. The 60-day policy, however, had not yet been adopted at the time of the RTC's appointment. The repudiation was declared on the sixtieth day following the promulgation of the 60-day policy.

I find no reason to accept the Bondholders' argument that a four-month delay from appointment was unreasonable. The Bondholders do not show that they were harmed in any way by the delay. Although it was technically inconsistent with the policy RTC adopted in that it came more than 60 days after RTC's appointment, that does not necessarily render it illegal or untimely. Furthermore, the policy is reasonably construed to allow 60 days from the policy statement in cases where the appointment preceded the adoption of the policy, at least absent a showing of unreasonableness on the merits.

The Bondholders argue further that the delay was incurred by reason of an impermissible consideration. As noted above, the delay was in large measure occasioned by the RTC's worry that if the RTC conservancy should be set aside in a pending court challenge, the benefits resulting from repudiation, which the RTC intended for depositors and taxpayers, might have redounded to the windfall profit of the shareholders of Franklin at the expense of the Bondholders. The Bondholders contend that the law does not contemplate delay for such a reason and that the delay must therefore be considered unreasonable and unlawful. I find no basis for this contention. It seems perfectly reasonable for the RTC to have worried that the repudiation might result in unintended (and unfair) consequences if the challenge to the RTC's appointment as conservator should succeed. I find the repudiation was done within a reasonable period as the statute requires.

■ 4. *Whether Roelle lacked authority to repudiate.* The Bondholders' fourth contention is that William Roelle, the Director of Resolutions and Operations for the RTC, was not empowered by the RTC's standards of governance to repudiate obligations of this magnitude. It is undisputed that Roelle alone made the determination to repudiate and that it was neither ap-

proved in advance nor subsequently ratified by the Board or by the Chairman.

The Bondholders' contention is not frivolous. In fact the RTC has no persuasive answer to it.

The governing statute, 12 U.S.C. § 1441a(b)(10)(J), provides that the RTC shall "prescribe through its Board of Directors bylaws that shall be consistent with law." The Board of Directors adopted bylaws for the RTC on August 9, 1989. Art. IV, Section 5 of the bylaws vests in the Board "the management of the Corporation" as well as "all the powers specifically granted by" FIRREA and other laws of the United States "and such incidental powers as shall be necessary to carry out the powers so granted." This section goes on to authorize the Board to "delegate any of its specific or incidental powers to any ... committee ... or to any officer or agent of the Corporation." Art. VII provides for the Officers. They are named in Section 1, and Section 2 provides that the "officers of the Corporation shall have such powers and shall perform such duties as the Chairperson or the Board of Directors may from time to time prescribe." On October 24, 1989, the Board of Directors approved delegations of authority for certain committees and officers of the RTC. The document is extremely detailed and consumes over 60 single-spaced, typed pages. Chapter IV of this document covers the "Delegations of Authority to the Executive Director and to the Director of the Resolutions and Operations Division," the latter being the officer (William Roelle) who made the repudiation decision. The delegations to these two high officers are highly specific and consume 18 pages, divided into two categories of Asset Authority and Operational Authority. Many of the delegations of authority carry limits of monetary amount (such as A(2) which provides authority to sell assets having an appraised value up to $50 million). The introductory language specifies as to authorizations carrying stated monetary limits that they are expected to be exercised only in the event that the pertinent "RTC Committee is unable to convene and the Executive Director is absent and the decision requires immediate action."

Nowhere among these extensive detailed delegations to the Director of Resolutions and Operations is there one relating to the repudiation of contracts, much less involving the very large amounts of money at issue in this instance.

RTC offers several ineffectual answers: First, dealing with the text of the delegations to Roelle's office, it cites the delegation numbered B(14), which confers the power "[t]o execute powers of attorney on behalf of the Corporation, as conservator, receiver, or in its corporate capacity, for the purpose of granting such powers as may be convenient in the disposition of assets acquired or controlled by the Corporation *or for the exercise of all the powers conferred upon the Corporation as receiver....*" (emphasis added). Through a combination of hyper-literal reading and loose interpretation, the RTC contends that this delegated power authorizes Roelle to repudiate the Bonds. Read literally, RTC argues, it authorizes Roelle to execute a power of attorney in favor of another person granting all the powers of the Corporation as receiver. Then shifting to a loose interpretation, the RTC reasons that Roelle cannot logically be empowered to delegate authority which he does not himself possess; thus he must be empowered himself to exercise all the powers of the Corporation, including repudiation without limit.

This reading makes nonsense of the elaborately crafted and carefully circumscribed delegations to Roelle's office. If it were true that this authorization conferred all the powers of the RTC as receiver, then the remainder of the 18 pages of more narrowly tailored authorizations would be reduced to a nullity. All would be subsumed in the broader, indeed global, power. It is perfectly clear in the context that, although inartfully drafted, this authorization is intended to permit the Director of the Resolutions and Operations Division to *delegate* any of the powers *he or she possesses*, and not to expand the power of that office to include all the powers of the RTC.

The RTC contends that because Roelle was in charge of all conservancy operations, he must have been authorized to order repudiations. Perhaps it would have been wise of the Board to confer that power on him. Perhaps the Board would have done so had it thought of the question. But the simple fact is, it did not do so. Furthermore, the delegations that were in fact conferred do not support the contention that the Board intended to confer such unlimited authority on Roelle's office. For the delegations actually conferred are full of restrictions at monetary amounts far below what would be involved in the repudiation of a $2.9 billion bond issue.

The RTC then argues that if the Director of Resolutions and Operations does not possess this power, this means that the Board of Directors must be importuned with many small issues affecting individual contract repudiations which it does not have time to deal with. There is no merit to the argument. First of all, the repudiation of a $2.9 billion bond issue is not a trifle. Second, if the Board wishes to delegate the authority to deal with such matters, it need only do so. Third, the inquiry here undertaken has been only to ascertain whether there had been a delegation of such authority *to the Director of Resolutions and Operations,* as he was the officer who acted to repudiate in this instance. The fact that no such authority was found does not necessarily mean that no such delegation was made to any other officer of committee of the Corporation. What has been established here is only that the officer who purported to repudiate on behalf of the RTC had not received a delegation of power to do so from the Board.

I conclude that the RTC did not effectively repudiate Franklin's zero coupon bonds. The fact that an unauthorized official of RTC purported to repudiate on RTC's behalf did not constitute a legally effective repudiation by the RTC.

\* \* \*

My resolution of this issue moots the Trustee's and Bondholders' other challenges to the actions of the RTC. I accordingly need not resolve whether the purport-ed repudiation violated the prohibition against avoiding security interests or whether the RTC employed the correct measure of damages as compensation for the repudiated bonds.

The court finds for the reasons stated above that the action of the RTC's Director of Resolutions and Operations of June 8, 1990, purporting to repudiate the Franklin zero coupon bond issue, did not effectively repudiate because that officer was not authorized under the RTC's charter by-laws and governing statute to take such action on the RTC's behalf.

## Conclusion

Judgment is granted to the Plaintiff–Trustee and the Bondholders.