**Donald F. MORTON, Plaintiff,**

v.

**ARLINGTON HEIGHTS FEDERAL SAVINGS AND LOAN ASSOCIATION, Resolution Trust Corporation as Receiver, Defendant.**

No. 90 C 6683.

United States District Court, N.D. Illinois, E.D.

June 22, 1993.

---

Kenneth Philip Ross, Eugene J. Schiltz, Robert F. Coleman & Associates, Chicago, IL, for defendant.

Thomas R. Meites, Michael M. Mulder, Annette R. Appell, Meites, Frackman & Mulder, Chicago, IL, for plaintiff.

## RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

WEISBERG, United States Magistrate Judge.

This is a dispute between the receiver for a failed savings and loan association and the retired president of the association, who asks the court to enforce an agreement requiring the association to pay him $1,100 per month for the rest of his life. The receiver contends that the agreement was properly repudiated. This court has jurisdiction under 12 U.S.C. § 1821(d)(6)(A) and 28 U.S.C. § 1331. The parties have consented to proceed before the undersigned pursuant to 28 U.S.C. § 636(c), and both parties have moved for summary judgment. For the reasons that follow, we grant the receiver's motion.

The following facts are undisputed. Plaintiff Donald F. Morton was the president and chairman of the board of Arlington Heights Federal Savings and Loan Association (Arlington). Morton retired on January 31, 1988.[1] Upon his retirement he received a lump sum payment of approximately $740,000 from his pension plan at Arlington and an automobile valued at approximately $14,000. A few months prior to his retirement, he and Arlington had entered into the "Donald F. Morton Retirement Agreement" dated October 26, 1987, Pl.Mo.Exh. C (the Agreement), which provided, among other things, that Morton was to receive $1,100 per month for the rest of his life. In return, he was to refrain from competing with Arlington and was to attend meetings of Arlington's board of directors and be available for consultation.

Almost two years after Morton retired, on December 7, 1989, the Office of Thrift Supervision declared Arlington insolvent and the Resolution Trust Corporation (RTC) became Arlington's receiver. (Although Arlington is no longer in business and its assets have been transferred, we refer to the defendant as "Arlington" although the RTC is the real party in interest.) On December 27, David E. Albertson, RTC's managing agent in charge of Arlington, notified Morton that all of Arlington's employment agreements had been terminated and that the Agreement was terminated as well. Pl.Mo.Exh. E. Morton had received all payments due under the Agreement up to that date. Plaintiff's Statement of Material Facts ¶ 13.

On March 15, 1990, Morton wrote RTC asserting a claim for damages for the repudiation of the Agreement, noting that he had not received proper notification of the repudiation. *Id.* Exh. F.[2] After receiving the

---

1. Morton remained on the payroll through March 6, 1988 because of accrued and unused vacation time.

2. 12 U.S.C. § 1821(d)(3)(B) and (C) requires the RTC as receiver promptly to publish and mail notices to the failed institution's creditors. Morton has withdrawn any claim with respect to the allegedly defective notice given him. Cmplt. Count II; Pl.Mem. in support of motion for summary judgment, note at 2.

letter, Albertson told Morton that he believed that the original notice had been insufficient and told him he would receive an additional check covering January—March 1990. The check was prepared, Pl.Mo.Exh. H, but was not given to Morton. Although Albertson had told Morton he could pick up his check, he called Morton again and told him he would have to employ the RTC claims procedure. On March 27, 1990, the receiver responded with another notice of the repudiation of the Agreement, and informed Morton how to file a claim. *Id.* Exh. G. On June 23, 1990, Morton filed a claim for $221,760 based on his then life expectancy of 16.8 years times the $13,200 per year he would receive under the Agreement. *Id.* Exh. I. His claim was denied on September 20, 1990, *id.* Exh. J, and Morton filed this suit November 16, 1990.

*Statutory Provisions*

Before considering the contentions of the parties we briefly review the applicable statute. The recent savings and loan crisis prompted Congress to enact the Financial Institution Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). FIRREA contains broad revisions in federal banking law to enhance certain powers of the FDIC and to eliminate impediments to the efficient disposition of failed financial institutions. Under FIRREA, the FDIC is authorized to act as receiver of insured federal depository institutions such as Arlington. 12 U.S.C. § 1821(c)(2). In its capacity as receiver, the FDIC may resolve claims against the failed institution. 12 U.S.C. § 1821(d)(3). The receiver may prescribe regulations regarding the allowance, disallowance and determination of claims. 12 U.S.C. § 1821(d)(4).

When the RTC as receiver takes over a failed institution, 12 U.S.C. § 1821(e)(1) permits the receiver to repudiate contracts that the receiver deems burdensome to the institution:

(1) **Authority to repudiate contracts**

In addition to any other rights a conservator or receiver may have, the conservator or receiver for any insured depository institution may disaffirm or repudiate any contract or lease—

(A) to which such institution is a party;

(B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and

(C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's discretion, will promote the orderly administration of the institution's affairs.

(2) **Timing of repudiation**

The conservator or receiver ... shall determine whether or not to exercise the rights of repudiation under this subsection within a reasonable period following such appointment.

A party to a repudiated contract or lease is entitled to claim "actual direct compensatory damages," but may not recover punitive or exemplary damages, damages for lost profits or opportunity or damages for pain and suffering. 12 U.S.C. § 1821(e)(3). The damage claim for repudiation of a service contract is deemed to have arisen as of the date the receiver was appointed and the contracting party is treated as a general creditor of the institution, except that services rendered after the receiver was appointed and before the contract is repudiated are to be paid according to the contract as administrative expenses. 12 U.S.C. § 1821(e)(7). There are no published regulations governing the repudiation of contracts by the RTC acting as receiver.[3] RTC did have internal guidelines for receivers exercising the power of repudiation, of which more later.

A person having a claim against a failed institution must first file a claim with the receiver under 12 U.S.C. § 1821(d)(5)(D). Within 60 days after the 180-day period following the claim's submission, or within 60 days of the date of any notice of disallow-

---

**3.** At the time the receiver repudiated the Agreement, certain regulations transferred from the former Federal Savings and Loan Insurance Corporation provided that the receiver of a savings and loan had the power to repudiate contracts it considered burdensome. See 12 C.F.R. §§ 382.-2(k), 383.3(a) (1990). No procedures were prescribed for making that determination. These regulations are no longer in force and are not found in the current 1992 compilation.

ance, a claimant may seek judicial review in the United States district court for the district in which the depository institution's principal place of business is located. 12 U.S.C. § 1821(d)(6). Morton has met these prerequisites.

*The Summary Judgment Motions*

■ Rule 56(c) of the Federal Rules of Civil Procedure provides that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The court is to draw all reasonable inferences in favor of the non-movant, but the non-moving party is required to go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

■ Local Rules 12(M) and 12(N) provide that a party moving for summary judgment must submit a statement listing the material facts it believes to be undisputed and which, taken together, entitle it to judgment as a matter of law. The other party must then respond specifically to these allegations, and, where it denies that a fact is undisputed, it must come forward with references to the record that support a contrary finding. Statements of undisputed fact not denied in accordance with the rule may be deemed admitted. *Schulz v. Serfilco, Ltd,* 965 F.2d 516 (7th Cir.1992).

Morton's motion is really two alternative motions. He first contends that, as a matter of law, the receiver did not properly repudiate the Agreement and that it is therefore still in force. Second, in the event that the court rejects that contention, he asks the court to find that he has sustained damages in the amount of $31,367, consisting of salary, pension and profit sharing contributions he relinquished in consideration for the Agreement. Arlington's motion simply asks for a judgment that it owes Morton nothing. We will address the motions together and determine whether judgment can be entered in favor of either party as a matter of law.

### A. Was the Agreement Executory—And Does it Matter?

■ Morton contends that 12 U.S.C. § 1821(e) permits the receiver to repudiate only "executory" contracts, and that the Agreement is not executory. In contrast to the familiar provision of the Bankruptcy Code, 11 U.S.C. § 365(a), the word "executory" does not appear in the statute. Morton cites no authority for his argument, and no court appears to have decided the question. Morton notes that the RTC's First Affirmative Defense referred to the RTC's power to repudiate *executory* contracts, and points to certain "Guidelines For Repudiation Or Disaffirmance Of Executory Or Unperformed Leases Or Contracts" employed by RTC, Pl.Mo.Exh. K.

■ The Guidelines, an internal document not formally adopted as a regulation, may not be used in interpreting the statute. *Pulley v. Bowen,* 817 F.2d 453 (7th Cir.1987) (Social Security Program Operations Manual could not be considered in interpreting statute because not adopted as a regulation). Furthermore, Arlington states in its brief, without contradiction, that the Guidelines were drafted under pre–FIRREA law. Def. Br. in Support of Mo. for Summary Judgment at 10 n. 3. We would be loath to read the word "executory" into the statute unless to omit it would lead to an absurd or unjust result. See *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.,* 872 F.2d 208, 213 (7th Cir.1989). While it would clearly be unjust (and perhaps unconstitutional) to permit an institution in receivership to walk away from a contract that had been fully performed on the other side, the provision for a damage remedy largely eliminates that concern. While the Seventh Circuit has noted the definite parallels between the claims handling procedure under FIRREA and the Bankruptcy Code, *Unisys Finance Corp. v. RTC,* 979 F.2d 609 (7th Cir.1992), this does not require us to add a limitation to FIRREA that is not there. Congress certainly had the bankruptcy model in mind, and it appears reasonable that Congress, well aware of the reference to executory contracts in the Bankruptcy Code, deliberately omitted

it in FIRREA in order to avoid disputes over whether a given contract was executory. Congress intended the administrative claims review process to provide a streamlined method for resolving most claims against failed institutions in a prompt, orderly fashion, without lengthy litigation. See *Marquis v. FDIC*, 965 F.2d 1148, 1152 (1st Cir.1992) (citing H.R.Rep. No. 101–54(I), 101st Cong., 1st Sess., at 418–19, reprinted in 1989 U.S.Code Cong. & Admin.News 86, 214–15).

In any event, adopting the definition of "executory" offered by Morton, the definition employed in this Circuit in interpreting § 365(a) of the Bankruptcy Code, the Agreement *is* executory, so we need not decide the question. The Supreme Court has said that Congress intended the term "executory contract" in § 365(a) of the Bankruptcy Code to mean a contract " 'on which performance remains due to some extent on both sides.' " *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522, n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (1983) (quoting H.R.Rep. No. 95–595, p. 347 (1977), U.S. Code Cong. & Admin.News 1978, p. 5787). The Seventh Circuit expanded on this formulation in *In re Streets & Beard Farm Partnership*, 882 F.2d 233, 235 (7th Cir.1989):

> Taken literally, this definition would render almost all agreements executory since it is the rare agreement that does not involve unperformed obligations on either side. In our view, however, this interpretation would not effect the intent of Congress. Rather, we believe that Congress intended § 365 to apply to contracts where significant unperformed obligations remain on both sides. See V. Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 460 (1974) (Defining an executory contract as an agreement where "the obligation of both the bankrupt and the other party are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other."). In determining the significance of

the remaining obligations under a contract we look to relevant state law, in this case the law of Illinois. [citations]

Following Illinois law, the Seventh Circuit has stated that the determination of materiality is a question of fact, involving inquiry into whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party would result in an unreasonable and unfair advantage to either party. *Heritage Bank & Trust Co. v. Abdnor*, 906 F.2d 292, 301 (7th Cir. 1990); see *Sahadi v. Continental Ill. National Bank & Trust Co.*, 706 F.2d 193, 196 (7th Cir.1983).

At the time of repudiation obligations remained on both sides. Arlington was required to pay Morton $1,100 per month for the rest of his life, and Morton was required to be available for directors' meetings and consultation and to refrain from competing with Arlington. The question thus is whether, if Morton ceased to perform his obligations, Arlington would have been justified in terminating the Agreement and refusing further performance. While it may often be inappropriate to decide a question of material breach on a motion for summary judgment, see *Sahadi*, 706 F.2d at 196–97, the intentions of the parties, as expressed in the Agreement, are sufficiently clear that we may do so here.

Morton contends, in effect, that the Agreement was primarily intended as ‚a form of deferred compensation for services already rendered to Arlington. His obligations to consult and refrain from competing with Arlington were merely incidental to that purpose. Morton takes the position that the $1,100 per month was to be paid him not only in consideration of his consulting services but also in consideration of his having foregone an annual salary increase and a contribution to Arlington's pension plan in 1987.[4] Since

---

4. It appears that Morton and Arlington agreed on December 27, 1983 that a $13,000 bonus for 1983 would be deferred until after Morton's retirement, Def.Mo.Exh. 9, but as this was not raised in Morton's statement of undisputed material facts we do not consider it in deciding his motion. Morton did refer to minutes of a meeting of Arlington's directors held December 19,

he gave up that consideration, he argues, the Agreement is not executory and the Association should not be permitted to avoid its obligation. Pl.Br. at 5.

Morton's contention is supported by the recitals at the opening of the Agreement, which refer to Morton's long service to Arlington, his impending retirement and his not receiving a salary adjustment or pension plan contribution for 1987. But while the primary purpose may have originally been to pay deferred compensation to Morton, it is clear from the Agreement that by the time of repudiation that purpose had been accomplished. Paragraph 3 of the Agreement reads as follows:

> 3. On January 2, 1988, employer shall pay to Northwestern Mutual Life Insurance Company, *as and for employee's [Morton's] deferred compensation* three additional annual premiums totaling $25,-696.50. Simultaneously, Employer shall release in favor of Employee that certain assignment made by Employee in favor of Employer dated December 14, 1981 and acknowledged by Northwestern Mutual Life Insurance Company on February 8, 1983. Upon such release, the policy heretofore subject to the Split Dollar Insurance Plan shall become the sole unencumbered property of Employee ...

Agreement, Pl.Mo.Exh. C, ¶ 3 at 2 (emphasis added). While this language does not exclude the possibility that the monthly payments could also constitute deferred compensation, the Agreement states in paragraph 5 that the monthly payments are *as and for services rendered and to be rendered pursuant to paragraph 4.* Id., ¶ 5. What are the "services rendered" pursuant to paragraph 4? Paragraph 4 tells us:

> 4. Employee agrees to hold himself available to advise and consult with, and be in attendance at such Board of Directors' meetings at reasonable times, places and

upon reasonable advance notice in writing, but not for a total of more than sixty days during any calendar year. Employer agrees that Employee shall be reimbursed for reasonable out-of-pocket expenses ... in order to make himself available for such consultation and advisory services and attendance at meetings of the Board of Directors.

*Id.* ¶ 4.

Thus the Agreement unambiguously states that the insurance premium payments and the release of the assignment was to pay Morton his deferred compensation, and the monthly payments were to compensate him for his consulting services and attendance at directors' meetings. It follows that once Arlington had performed its obligations under paragraph 3, the primary purpose of the Agreement—paying Morton's deferred compensation—had been accomplished, and nothing remained except Morton's obligation to hold himself available for consultation and Arlington's obligation to pay him for that availability.

■ Illinois courts have held that whether or not a breach of a contract is "material" and thereby discharges the other party's duty to perform is a question to be decided on "the inherent justice of the matter." *Niemoth v. Kohls,* 171 Ill.App.3d 54, 121 Ill.Dec. 37, 48, 524 N.E.2d 1085, 1096 (1st Dist.1988). We think it is clear that, once Arlington fulfilled its obligations under paragraph 3, the failure of either party to perform would excuse performance by the other. Had the payments stopped, Morton would hardly have understood that he was obliged to give Arlington his time and advice, or abstain from competition with Arlington. And had Morton refused to perform his obligations, Arlington would have been entitled to stop paying him. We therefore conclude that the Agreement was an executory con-

1981, at which Morton declined an increase in his compensation because of "the severe economic condition and [Arlington's] loss of earnings." Pl.Mo.Exh. B. Morton has not shown that this was, or could have been, consideration for the Agreement executed nearly six years later, since there appears to have been no contractual obligation to pay Morton. That Morton's for-

bearance in the past may have inclined Arlington's directors to generosity does not establish bargained-for consideration. Minutes of a meeting of Arlington's directors at which the Agreement was approved, Pl.Mo.Exh. D, confirm that the Agreement was to be in lieu of a salary increase for 1987, and mentions no other deferred compensation or other consideration.

tract and there is no doubt it was subject to repudiation under 12 U.S.C. § 1821(e)(1).

*Was the Repudiation Improper?*

### A. Jurisdiction

■ At the outset, we doubt whether we have jurisdiction to review a receiver's repudiation of a contract, as opposed to the denial of a claim for damages *resulting* from the repudiation. While the statute provides for judicial review of *claims,* 12 U.S.C. § 1821(d)(6), including claims for damages for repudiation of a contract, 12 U.S.C. § 1821(e) is silent concerning judicial review of the repudiation decision itself. 12 U.S.C. § 1821(d)(13)(D) sharply limits judicial review:

(D) **Limitation on judicial review**

Except as otherwise provided in this subsection, no court shall have jurisdiction over—

(i) any claim or action for payment from, or any action seeking determination of rights with respect to, the assets of any depository institution for which the Corporation has been appointed receiver, including assets which the Corporation may acquire from itself as receiver; or (ii) any claim relating to any act or omission of such institution or the Corporation as receiver.

"This subsection" means § 1821(d). *Marquis,* 965 F.2d at 1153. The receiver's repudiation of the Agreement is, of course, an "act or omission of such institution or the Corporation as receiver." An action seeking to set aside the repudiation of a contract, as contrasted to an action asserting a claim for resulting damages, is not permitted by § 1821(d), or, so far as we can tell, any other provision. We agree with the district court for the District of Colorado that "[t]he FIR-REA statute does not provide that the RTC explain its actions or that a court may review the basis for that decision." *Jenkins–Petre Partnership One v. RTC,* 1991 WL 160317 *5 1991 U.S. Dist. LEXIS 20240 *13 (D.Colo. 1991).

We note, however, that apart from quoting *Jenkins–Petre* Arlington did not raise the question of the reviewability of its decision,

and proceeded to defend the reasonableness of the receiver's action. We further note that other district courts have reviewed a receiver's repudiation decisions for abuse of discretion, although generally without discussing the statutory basis for doing so. See *IBJ Schroder Bank & Trust Co. v. RTC,* 803 F.Supp. 878, 883–84 (S.D.N.Y.1992); *Monument Square Associates v. RTC,* 792 F.Supp. 874, 877 n. 5 (D.Mass.1991); *Atlantic Mechanical, Inc. v. RTC,* 772 F.Supp. 288 (E.D.Va.1991), aff'd mem. 953 F.2d 637 (4th Cir.1992); *Union Bank v. FSLIC,* 724 F.Supp. 468, 471 (E.D.Ky.1989).

One opinion expressly found jurisdiction to review a receiver's repudiation of a contract, but its reasoning is not persuasive. In *Rexam Ltd. Partnership, S.E. v. RTC,* 766 F.Supp. 41, 44 (D.P.R.1991), vacated after settlement, 1991 WL 486908 (1st Cir.1991), the court reasoned

In fact, 12 U.S.C. § 1821(d)(6)(A) provides for the judicial review of the RTC's decision to allow or disallow a claim. . . . If a claimant prefers to seek administrative review of the RTC's decision, then "the final determination of the Corporation with respect to such claim shall be subject to judicial review under chapter 7 of Title 5." 12 U.S.C. § 1821(d)(7)(A). These FIR-REA sections demonstrate that the RTC's discretionary power is not without limit. Furthermore, other federal courts have found it within their discretion to review the RTC's repudiation of contracts. [citing *Union Bank* ] In *Union Bank,* the RTC's decision to repudiate a contract was effectively deemed equivalent to a decision of disallowing the claim itself. Hence, in this case the RTC's right to solely compensate a claimant with monetary damages once it repudiates a contract . . . does not interfere with the Court's jurisdiction to review the RTC's repudiation of the contract itself. Therefore, subject matter jurisdiction is not lacking in this case and the defendant's Motion to Dismiss must be DENIED.

We do not read *Union Bank* as denying the distinction between reviewing a claim and reviewing a decision to repudiate a contract, and such a position would be untenable. Ju-

dicial reversal of a decision to repudiate leaves the institution with an ongoing contractual commitment, while reversal of the denial of a claim requires only that the claimant receive damages while leaving the contractual relationship terminated. It is our view that Congress intended to cut short any judicial inquiry into the propriety of the repudiation. Nevertheless, since this is a developing area of the law, and to avoid revisiting these questions in the event we are mistaken, we will address Morton's contentions.

### B. Procedure

■ Morton claims that the repudiation was ineffective because no reason was given for the repudiation and the receiver did not make a finding that the Agreement was burdensome or otherwise interfered with the orderly administration of Arlington's affairs. Pl.Br. at 8. These contentions are meritless. The statute does not require that the receiver give reasons for repudiating a contract, but the reason can be readily inferred from Albertson's letter of December 27, 1989. Albertson not unreasonably viewed the Agreement with its consulting provision and noncompete covenant as a form of employment agreement and terminated it for the same reason he terminated the other employment agreements: Arlington was insolvent. A prudent receiver would not let Arlington remain contractually committed to employees whose services it might no longer want, and the statute required it to repudiate the employment agreements within a reasonable time if it wished to do so. 12 U.S.C. § 1821(e)(2).

Nor is there a requirement in the statute that Albertson or the RTC make an explicit finding of burdensomeness. No procedure is prescribed. The "Guidelines For Repudiation Or Disaffirmance Of Executory Or Unperformed Leases Or Contracts," Pl.Mo.Exh. K, are clearly *internal* agency guidelines, not promulgated regulations. While an agency must follow its own procedures even though they are more stringent than would constitutionally be required, *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974), this does not apply to an agency's internal guidelines and directives not promulgated and published as regulations. Infor-

mally adopted instructions to an agency's employees do not have the force of law and do not confer legal rights upon persons dealing with the agency. *Schweiker v. Hansen,* 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (Social Security employee's failure to follow directive in internal claims manual had no effect on applicant's legal rights); *Multnomah Legal Service Workers Union v. Legal Services Corporation,* 936 F.2d 1547, 1554 (9th Cir.1991) (Legal Services Corporation's right to examine personnel files kept by offices receiving LSC funding not limited by statements in LSC's internal monitoring handbook); *Parker v. Sullivan,* 891 F.2d 185, 190 (7th Cir.1989) (Social Security Programs Operations Manual not binding); *First Family Mortgage Corp. of Florida v. Earnest,* 851 F.2d 843, 845 (6th Cir.1988) (Veterans Administration's failure to follow internal VA guidelines regarding refunding of delinquent VA guaranteed mortgages gave mortgagors no right of action); *Pulley, supra.* Furthermore, the Guidelines by their own language are not binding: "It is therefore *suggested* that an independent analysis of each transaction subject to disaffirmance be made taking the following into consideration...." Pl.Mo. Exh. K at 1 (emphasis added).

Morton has not shown that the statute or regulations entitled him to any particular procedure. We ignore the passing reference to "fundamental notions of due process" in his reply brief, as he does not present an argument that the "taking" of contractual rights through a receiver's repudiation is either uncompensated or without due process of law.

### C. Substance

■ Having determined that Morton was not entitled to any particular procedure, we turn to his contention that the decision to repudiate the Agreement was somehow arbitrary, capricious, or an abuse of discretion. Assuming we have jurisdiction to review it, the decision to repudiate was eminently reasonable. *Any* unnecessary payment is burdensome to an insolvent institution, and clearly Arlington was better off without the Agreement.

As the receiver points out, after Arlington was closed there were no board meetings for Morton to attend and no operating institution not to compete with. To the extent the receiver needed Morton's services, it could arrange to pay him for them as needed, rather than pay him $1,100 per month whether it needed them or not. The receiver and its attorneys did consult with Morton concerning pending litigation against Arlington, but this hardly makes the decision to repudiate the Agreement arbitrary. There was no evidence that Morton sought any compensation for these services. Construing the record in Morton's favor, no reasonable factfinder could find the decision to repudiate the Agreement arbitrary, capricious or contrary to law.

*Damages*

■ We now turn to the second part of Morton's motion, what damages Morton may claim as a consequence of the repudiation. Here, 12 U.S.C. § 1821(d)(6)(A) does give the court jurisdiction to review the receiver's denial of Morton's claim for damages. In his summary judgement motion he alternatively seeks to recover the consideration he gave for the Agreement. Morton has submitted calculations presented to Arlington's directors in December 1986 showing that if Morton was not given a salary increase, Arlington would save between $21,873 and $26,308 in salary, pension plan and profit-sharing plan contributions for 1987, depending upon whether Morton's salary increase would have been 8% or 10%. Pl.Mo.Exh. D. According to Morton, if this savings is extended through Morton's ten weeks on the payroll at the beginning of 1988, the amount saved by Arlington and foregone by Morton totals between $26,079 and 31,367. Pl.Br. at 9. (Arlington's savings and Morton's loss need not be identical because of timing and tax considerations we do not address here.)[5] Morton asks for summary judgment in the latter amount.

Arlington responds that Morton has already received much more under the Agreement, namely $22,000 in monthly payments through December 1989 and $85,655 as a result of certain life insurance transactions.[6] Arlington asserts, and Morton admits, that it obtained a $150,000 policy on Morton's life, for which it paid annual premiums of $8,565.50 for seven years (1981–1988) for a total of $59,958.50. Pl. resp. to Def. Statement of Material Facts ¶ 13, 14. This was a "split dollar" arrangement; in the event of Morton's death, Morton's beneficiary would receive the $150,000 death benefit, less the sum of Arlington's premium payments, which would be repaid to Arlington. See letter dated November 1, 1982 from Arlington to Morton, Def.Mo.Exh. 5. Morton executed an assignment to Arlington of the amount of premiums paid. In 1987, as part of the Agreement, Arlington released its claim for reimbursement of the premiums upon Morton's death. Arlington also agreed to pay, and paid, three annual premiums totalling $25,696.50 in a single payment to the insurer. Adding these together, Arlington calculates that Morton has received $85,655.00 in deferred compensation, and Morton agrees. Pl. resp. to Def. Statement of Material Facts ¶ 14.[7]

---

5. Morton's estimate of his damages was not included in Morton's statement of material facts as required under Local Rule 12(N), which would be sufficient grounds for denying Morton's motion. Nevertheless, Arlington does not appear to contest Morton's assertion that he did go without a salary increase for 1987 and this was consideration—or partial consideration—for the Agreement. Rather than require Morton to amend his statement of facts, we will proceed to decide the motion, since Rule 56(c), Fed.R.Civ.P., permits summary judgment on the issue of liability, even if the amount of damages remains in dispute.

6. The receiver does not include the value of the automobile transferred to Morton, presumably because Arlington had earlier designated it as a gift. See Def.Mo.Exh. 6.

7. Morton did not actually receive that much; Morton, or more precisely his beneficiary, would realize the benefit of Arlington's release of its $59,958.50 lien on the insurance proceeds only upon Morton's death. If Morton had a life expectancy of 16.8 years in 1990, the anticipated date of his death would have been further away in 1988. $59,958 that far in the future would have been worth far less than that amount in present cash. Morton waived the argument by admitting that he received $85,655 in deferred compensation and failing to raise the point in his brief.

Morton objects that it does not follow that he is not entitled to damages because he gave other consideration in addition to his deferred compensation, namely his promise not to compete. If this were added in, it could total more than the $85,655 he received, thus entitling him to damages and making summary judgment inappropriate.

This is not enough to withstand summary judgment. In the first place, it is far more likely that Arlington was paying Morton for his abstention from competition on a month-to-month basis, rather than making installment payments on a one-time purchase of Morton's lifetime commitment not to compete with it. It is significant that the Agreement makes Morton's promise not to compete in paragraph 6 co-extensive with his entitlement to advisory director fees pursuant to paragraph 5. If this were the case, Morton has lost only future payments for his future services—or non-services to other institutions—which are not compensable as damages.

But even if we regard the covenant not to compete as irrevocably purchased for a lump sum, Morton has offered no evidence of its value. Drawing all reasonable inferences in favor of Morton, we may infer from the parties' including the covenant in the Agreement that it was worth *something;* we cannot infer that it is worth more than $50,000, the difference between what Morton estimates he gave up in deferred compensation and the amount he acknowledges he received.

 When confronted with a motion for summary judgment, a party who bears the burden of proof on an issue must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact requiring trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). The party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Id.* at 587, 106 S.Ct. at 1356.

We conclude that there is no genuine dispute that at the time of the repudiation of the Agreement Morton had received from Arlington more than he had given up in consideration of his entering into the Agreement. Morton was entitled only to receive the monthly payments in consideration of his continuing availability for consulting and his abiding by his promise not to compete. Payments under the Agreement were current at the time of repudiation, and repudiation did not cause Morton any damages compensable under FIRREA. Morton's motion for summary judgment is denied, defendant Arlington's motion for summary judgment is granted, and judgment will be entered in favor of Arlington and against Morton.