The **EMPLOYEES' RETIREMENT SYSTEM OF ALABAMA, et al., Plaintiffs,**

and

**IBJ Schroder Bank & Trust Company, as Trustee, Plaintiff–Intervenor,**

v.

The **RESOLUTION TRUST CORPORATION, as Conservator for Franklin Federal Savings Association, Defendant.**

No. 92 Civ. 8435 (PNL).

United States District Court,
S.D. New York.

Dec. 22, 1993.

Gibson, Dunn & Crutcher, New York City (Mitchell A. Karlan, Robert F. Serio, Colleen D. Duffy, W. James Hall, of counsel), for plaintiffs.

Sullivan & Cromwell, New York City (Michael A. Cooper, Theodore Edelman, Diane D'Arcangelo, of counsel), for plaintiff-intervenor.

Hopkins & Sutter, Chicago, IL (Glen H. Kanwit, David B. Goroff, John P. Ratnaswamy, of counsel), Dewey, Ballantine, New York City (Jonathan W. Miller, Robin D. Adelstein, Jennifer Jones, of counsel), for Resolution Trust Corp. as Conservator for Franklin Federal Sav. Ass'n.

## OPINION AND ORDER

LEVAL, District Judge.

*Findings of Fact and Conclusions of Law*

This case presents a number of important questions of first impression under the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA). The Resolution Trust Corporation ("RTC") took over Franklin Savings Association ("Franklin"). Exercising its powers under FIRREA, the RTC acted to repudiate three series of secured zero coupon bonds issued by Franklin and to pay compensation to the bondholders limited to the "accreted value" of the bonds. The Trustee for the bondholders as well as a large percentage of the holders of the bonds challenged the action in this court. In October 1992, this court held that the RTC official who purported to repudiate the bonds lacked the authority to do so and that the repudiation was therefore void. Meanwhile, officials at the RTC who did have such authority repudiated the bonds a second time and also ratified the original repudiation. After the second repudiation and roughly contemporaneously with the ratification, the Trustee defeased the bonds in accordance with the terms of the indenture so as to cause liquidation of the collateral. The holders of a majority of the bonds (the "Bondholders"), joined by the Trustee, then brought this action against the RTC, seeking a declaratory judgment that the RTC has no rights in the defeasance collateral and that this collateral should be distributed to the bondholders in accordance with the indenture.[1] The RTC cross-claimed, asking for a declaratory judgment that the bonds had been validly repudiated, that the bondholders damages are governed by FIRREA, that the proper damages are the "accreted value" of the bonds, as described in an RTC release of April 10,

1990, and that the collateral held by the Trustee in excess of these damages is the property of the RTC.

The parties stipulated to the submission of a written record for final trial on the merits. The court finds in favor of the RTC on all the disputed issues, except the proper measure of damages.

## Background

### A. The Bonds and the Indenture

On December 1, 1984, pursuant to a bond indenture (the "Indenture") between Franklin and plaintiff-intervenor IBJ Schroder Bank & Trust Company as trustee for the bondholders, Franklin issued three series of bonds with maturities of 30, 35 and 40 years, having an aggregate face value of $2.9 billion (the "Bonds"). These Bonds, and the Indenture governing them, were the focus of the earlier action, *IBJ Schroder Bank & Trust Co. v. RTC*, 90 Civ. 2736 (PNL) ("*Franklin I*"), and are described extensively in my decision on the merits in that case, 803 F.Supp. 878, 879–81 (S.D.N.Y.1992), familiarity with which is assumed. I will describe the relevant background more briefly here.

The Bonds are zero coupon bonds. This means that the issuer makes no interest payments; at maturity the issuer pays the face amount of the bonds. The Bonds are sold in the initial offering at a discount from face value, which represents the issuer's interest cost for the borrowing. The initial offering was priced so that the yields-to-maturity of the 30, 35 and 40 year bonds were 11.75%, 11.375%, and 11%, respectively.

After the initial offering, the Bonds traded in the secondary markets. The plaintiff Bondholders are state pension funds, insurance companies and investment advisors who hold approximately 78% of the Bonds, all purchased in open secondary market transactions. Because prevailing interest rates dropped substantially in the years following issuance, the Bonds traded in the secondary markets at prices representing lower yields to maturity, or relatively higher prices than if interest rates had remained constant.

1. The Bondholders and the Trustee are sometimes referred to collectively as "plaintiffs."

Under the Indenture, the Bonds were unusually well-secured by collateral (the "Eligible Collateral"), consisting of cash and certificates issued by the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, and the Government National Mortgage Association, deposited by Franklin with the Trustee. In order to secure the payment of the Bonds at maturity, the Trustee holds a first perfected security interest in the Eligible Collateral for the benefit of the Bondholders.[2] The Indenture requires the Trustee to value the Eligible Collateral each week to ensure that its market value, discounted by thirty percent, equals the cost of purchasing "Eligible Zero Coupon Securities" sufficient to pay the principal amount of the outstanding Bonds at their respective maturities.[3] This mechanism ensures that the Bonds are always over-collateralized.

The Indenture provides remedies to guarantee that the Bonds will be paid in full at their maturities even if the financial status of Franklin deteriorates. If Franklin fails to satisfy capital requirements in regulatory filings with the United States Office of Thrift Supervision ("OTS"), the Trustee is obligated to liquidate the Eligible Collateral and purchase Eligible Zero Coupon Securities in an amount sufficient to pay the face amount of the Bonds at their maturities. If after another ninety days Franklin fails to submit another regulatory report to OTS stating that it is in compliance with regulatory capital requirements, the Trustee must "defease" the bonds by transferring the Eligible Zero Coupon Securities to Defeasance Trusts held by the Trustee for the benefit of the Bondholders. At that point, all substantial rights and obligations of Franklin under the Bonds and the Indenture terminate. The excess security would be returned to Franklin.

### B. The RTC's Original Repudiation

On February 16, 1990, the OTS appointed the RTC as conservator of Franklin, effectively terminating Franklin's status as a private institution. On April 10, 1990, Franklin, though the RTC as conservator, disclosed in a filing with the OTS that it was not in compliance with the applicable regulatory minimum capital requirements. Under the Indenture, this triggered the Trustee's obligation to liquidate the Eligible Collateral and purchase Eligible Zero Coupon Securities. During this period, the RTC instructed the Trustee not to pursue any potential remedies under the Indenture, including defeasance.

Under FIRREA, as described in more detail below, the RTC has the right to repudiate certain obligations of insolvent institutions and to pay prescribed damages. On April 10, 1990, the RTC issued a Policy Statement concerning the repudiation of, and payment of interest on, direct collateralized borrowings of a savings association after the RTC appointment as receiver or conservator. The Statement provided that repudiations of such obligations, which under FIRREA must occur within a "reasonable period following" the RTC's appointment as conservator or receiver, 12 U.S.C. § 1821(e)(2), would occur within sixty (60) days of the appointment (failing which the terms of the contract at issue would be enforceable through the term of the receivership). In addition, the Statement announced that damages payable by the RTC upon receivership would be limited to principal owed plus imputed interest; in the case of zero coupon bonds, this means the RTC would pay "accreted value," which is the issue price plus interest ("to the date of redemption or payment") reflected in the initial offering price as the "yield to maturity."

On June 8, 1990, the RTC notified the Trustee that the RTC had disaffirmed and repudiated the Bonds and Indenture; the RTC directed the Trustee to refrain from taking any action pursuant to the remedial provisions of the Indenture. The RTC believed that by repudiating the Bonds it could save approximately $200 million for the institution and also immediately obtain from the Trustee very substantial funds that the

---

2. The Trustee also holds a junior security interest in the collateral to secure payment for its services.

3. "Eligible Zero Coupon Securities" are defined as U.S. Treasury securities and similar obligations of agencies and instrumentalities of the United States.

Trustee would otherwise have been required to hold as collateral.[4] On July 25, 1990, the RTC announced that August 8, 1990 would be the payment date for the Bonds; no interest or accreted value would be recognized after that date.

### C. *Earlier Litigation, the Re–Repudiation, and the Ratification*

In the earlier action, the Trustee and the Bondholders challenged the RTC's actions and policies, alleging that (1) the RTC's repudiation was void because (a) inconsistent with the standards of the governing statute and (b) unauthorized by the RTC, (2) repudiation violated the due process and takings clauses, and (3) in the event that the Indenture and the Bonds were lawfully repudiated, the damages to which the Bondholders are entitled differs from that offered by the RTC. After trial on a submitted record, I concluded that the RTC had made the determinations required by statute and that the repudiation was neither arbitrary nor capricious nor untimely. 803 F.Supp. at 883–84. However, my opinion also concluded that William Roelle, the RTC's Director of Resolutions and Operations, who performed the repudiation, lacked the authority to repudiate the Bonds on behalf of the RTC under the RTC's applicable by-laws. Accordingly, I held that the RTC did not effectively repudiate the Bonds. My Opinion and Order was issued October 13, 1992; judgment was granted to the Trustee and the Bondholders on October 20, 1992 and was entered on October 21, 1992.

The issue of Roelle's authority had become a focus of the litigation in the spring of 1992, and the trial record was briefly reopened at that time for further evidence on that issue. Apparently in light of the uncertainty concerning the validity of Roelle's actions, the RTC took remedial action while the case was sub judice. On July 16, 1992, the OTS issued Order No. 92–319, directing a "pass-through receivership" of Franklin. OTS chartered a new federal mutual savings association, Franklin Federal Savings Association ("Franklin Federal"), which was then placed in conservatorship with the RTC as conservator. Through a "purchase and assumption agreement" ("P & A Agreement"), dated July 17, 1992, all of the assets and all of the secured deposits and liabilities of Franklin were passed to Franklin Federal. On September 11, 1992, the RTC held a meeting at which Roelle again made the determination to repudiate the Bonds. Under the RTC's new delegations, Roelle now possessed the authority to make such a decision where he had the concurrence of the Senior Vice President and General Counsel (who was Richard Aboussie). Accordingly, Roelle and Aboussie both signed a Senior Vice–President Decisional Memorandum approving the repudiation of the Bonds, which was to be effective only if this court found the original repudiation invalid. On September 14, 1992, the RTC notified the Trustee of the conditional re-repudiation.

This court then issued its decision invalidating the June 1990 repudiation, and entered judgment on October 21, 1992. The next day, October 22, 1992, Albert Casey, the Chief Executive Officer of the RTC, held a special meeting and, by CEO Resolution No. 92–CEO–15, ratified the June 8, 1990 repudiation. The resolution stated that Casey concluded that Roelle's repudiation decision "was correct for the reasons set forth by Mr. Roelle" and that Casey "hereby ratifies" Roelle's decision of June 8, 1990 "and such ratification is hereby made retroactive and effective as of the date of the original repudiation." Based on this ratification, the RTC

---

**4.** Apparently, as of the effective date of the original repudiation, August 8, 1990, the accreted value of the Bonds, which was the amount of damages the RTC proposed to pay to all the holders of the Bonds, was approximately $124,590,000. However, the cost of government-backed zero coupon securities with the same face amounts and maturities as the Bonds (which, as explained below, is what the Bondholders claim is the correct damages if the RTC has lawfully repudiated) totalled approximately $235,838,000.

As of August 29, 1990, the Trustee held collateral worth approximately $413 million, reflecting the degree to which the Bonds were over-collateralized.

As of September 14, 1992, the date of the re-repudiation described below, the accreted value was approximately $157,552,000; by way of comparison, the cost of comparable government zero coupon bonds on October 21, 1992, approximately five weeks later, was on the order of $305 million.

moved for relief from the judgment, seeking to reopen the case and receive new findings of fact and conclusions of law or, in the alternative, a new trial. In an Opinion and Order dated July 22, 1993, I denied the motion.

Meanwhile, because the Trustee believed (based on my October 13, 1992 decision and its perception that the September 1992 re-repudiation was ineffective) that the Indenture was still in effect, the Trustee began on October 21, 1992 to exchange the Eligible Collateral securing the Bonds and defease the Bonds in accordance with the terms of the Indenture. The defeasance process was completed on October 23, 1992. However, because the RTC claimed rights to the assets of the defeasance trusts, the Trustee did not distribute those assets in accordance with the Bondholders' instructions.[5] As noted above, on October 22, the RTC ratified the June 8, 1990 repudiation of the Bonds.

On November 20, 1992, the Bondholders brought this action.

## Discussion

The right of the RTC to repudiate obligations as conservator or receiver of an insolvent institution is set out in Section 212(e) of FIRREA, codified at 12 U.S.C. § 1821(e).[6] Section 1821(e)(1) provides that the RTC, as conservator or receiver or an insolvent institution,

> may disaffirm or repudiate any contract or lease—
>
> (A) to which such institution is a party;
>
> (B) the performance of which the conservator or receiver, in the conservator's or receiver's discretion, determines to be burdensome; and
>
> (C) the disaffirmance or repudiation of which the conservator or receiver determines, in the conservator's or receiver's

discretion, will promote the orderly administration of the institution's affairs.

Such repudiation must occur within a "reasonable period following" the RTC's appointment as receiver or conservator, § 1821(e)(2), and, as noted, the RTC itself has interpreted this provision to require repudiation within sixty days of its appointment.

Section 1821(e)(3) provides that, with certain exceptions, the liability of the RTC for the

> (A) ... repudiation of any contract ... shall be—
>
> (i) limited to actual direct compensatory damages....
>
> (B) For purposes of subparagraph (A), the term "actual direct compensatory damages" does not include—
>
> (i) punitive or exemplary damages;
>
> (ii) damages for lost profits or opportunity; or
>
> (iii) damages for pain and suffering.

In addition, § 1821(e)(11) provides that,

> No provision of this subsection [§ 1821(e)] shall be construed as permitting the avoidance of any legally enforceable or perfected security interest in any of the assets of any depository institution except where such an interest is taken in contemplation of the institution's insolvency or with the intent to hinder, delay, or defraud the institution or the creditors of such institution.

### 1. Res Judicata.

■ Plaintiffs first contend that the doctrine of res judicata bars the RTC from relying on either the re-repudiation or the ratification in support of its position that the Indenture is no longer in effect. Plaintiffs point out that res judicata, or claim preclu-

---

5. The Indenture entitles the holders of 75% or more of the outstanding Bonds to instruct the Trustee to distribute the assets of the defeasance trusts directly to the Bondholders prior to maturity. The Bondholders would like to give such an instruction to the Trustee, but the RTC has apparently threatened to take punitive action (including seeking an asset freeze) against the Trustee if the Trustee obeyed such an instruction. This standstill precipitated the present action.

6. 12 U.S.C. § 1821 actually sets out the powers of the Federal Deposit Insurance Corporation ("FDIC"), but 12 U.S.C. § 1441a(b)(4) gives the RTC the "same powers and rights to carry out its duties with respect to institutions" as those given to the FDIC by § 1821.

sion, "prevents litigation of a matter that could have been raised and decided in a previous suit, whether or not it was raised." *Murphy v. Gallagher*, 761 F.2d 878, 879 (2d Cir.1985) (citations omitted); *accord Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981) ("final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action"); *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979). The plaintiffs go on to note that both the re-repudiation and the ratification were events entirely within the control of the RTC. The RTC therefore could have re-repudiated the Bonds or ratified the original repudiation earlier than it did. Had it done so, the RTC could have raised these events in the course of the *Franklin I* litigation, and that final judgment might have been different. As the RTC "consciously decided not to advance the theories and evidence of ratification and re-repudiation in its defense or in support of its counterclaims during the trial of *Franklin I*," plaintiffs contend, the RTC is now barred from raising these matters now. Plaintiffs' Summary Judgment Mem. at 14–15.

I reject this argument. The events at issue (the re-repudiation and ratification) had not occurred at the time the record in *Franklin I* closed. It is true that these were events within the control of the RTC, and that the RTC might have caused these events to occur earlier. Nonetheless, I do not believe application of *res judicata* is appropriate here. In denying the RTC's motion to reopen the judgment in *Franklin I*, I explained that,

> The litigation that was conducted [in *Franklin I*] was over the question whether the RTC's purported act of repudiation *on June 8, 1990*, effectively terminated the executory portion of the contract of debt. This court decided it did not. Whether the RTC thereafter effectively repudiated the Bonds by virtue of a new act was not at issue in the dispute adjudicated on October 20, 1992. The Judgment obviously neither validated nor invalidated acts by the RTC that had not yet occurred. If the RTC retained the power after the court's judg-

ment to repudiate the Bonds by ratification, the effectiveness of that subsequent act does not turn on whether a prior judgment relating to earlier acts is or is not vacated. The parties may well submit new pleadings addressed to the consequences of a post-judgment ratification. But that ratification has no bearing on the finality on the judgment addressed to the facts that were in dispute.

Opinion and Order of July 22, 1993, at 9 (emphasis in original). The present case presents the mirror issue of my earlier ruling: as the ratification and re-repudiation had not occurred at the time of the judgment in *Franklin I*, the RTC could not justifiably rely on them to justify reopening judgment, but, by the same rationale, the RTC should not now be barred from raising these matters in a different litigation. *Cf. Manning v. City of Auburn*, 953 F.2d 1355, 1360 (Fed. Cir.1992); *Los Angeles Branch, NAACP v. Los Angeles Unified School District*, 750 F.2d 731, 739 (9th Cir.1984) (en banc), *cert. denied*, 474 U.S. 919, 106 S.Ct. 247, 88 L.Ed.2d 256 (1985).

### 2. *The Validity of the Re-repudiation and the Ratification.*

Plaintiffs next contend that the re-repudiation and ratification were both invalid, that the Indenture is therefore still in effect, that the Bonds have been legally defeased, and that the Trustee should distribute the assets of the defeasance trusts to the Bondholders in accordance with the terms of the Indenture. I conclude, however, that the RTC's actions in September 1992 validly repudiated the Bonds.

### A. *The September 14, 1992 re-repudiation.*

(i) *Timeliness.* Plaintiffs first contend that the September re-repudiation was untimely. The repudiation occurred within sixty days of the RTC's appointment as conservator for Franklin Federal on July 16, 1992. This was consistent with the RTC's Policy Statement interpreting the requirement of § 1821(e)(2) that the RTC "shall determine whether or not to exercise the rights of repudiation ... *within a reasonable*

*period* following" the RTC's appointment as requiring repudiation within sixty days.

The fact that the re-repudiation occurred two and a half years after the RTC's appointment as conservator of Franklin is arguably irrelevant, for the statute clearly refers to a "reasonable period" after the RTC appointment to the capacity in which the repudiation is made. In any event, because of the RTC's prompt initial effort to repudiate, the confusion that arose over Roelle's authority, and the extended litigation on that point, I would find that the September 1992 repudiation occurred "within a reasonable period" following the RTC's initial appointment. The September 1992 repudiation was timely.[7]

■ Plaintiffs next contend that the RTC cannot avoid FIRREA's requirement that repudiation occur within a reasonable time of the RTC's appointment by claiming that the sixty-day period begins a second time when the RTC is appointed as conservator for a different institution. In its April 10, 1990 Policy Statement, the RTC announced its view that in the case of subsequent receiverships resulting from a pass-through receivership, "the subsequent receiver shall have the option to repudiate the contract under the same terms and conditions set out above even if honored by the prior conservator and/or receiver." Plaintiffs argue that this construction of the statute would simply allow the RTC to evade the requirement that it repudiate contracts within a "reasonable period," as the agency could always use a pass-through receivership whenever it belatedly decided to repudiate a contract. While plaintiffs may be correct that such a power might sometimes be subject to abuse, the fact is that the statute itself simply provides that the RTC as "conservator or receiver for *any* insured depository institution may disaffirm or repudiate any contract or lease." § 1821(e)(1) (emphasis added). This language appears to give the RTC the power to repudiate within a "reasonable period," § 1821(e)(2), each time the RTC is appointed as receiver or conservator. Even if I were to conclude that the statute is ambiguous on this point, I would accede to the permissible interpretation adopted by the RTC. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) ("if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute"); *see also RTC v. CedarMinn Bldg. Ltd. Partnership*, 956 F.2d 1446, 1450–55 (8th Cir.) (deferring to "the most reasonable interpretation" of RTC that statute gives RTC separate right of repudiation as receiver even when it follows itself as conservator), *cert. denied,* —— U.S. ——, 113 S.Ct. 94, 121 L.Ed.2d 56 (1992); *1185 Avenue of the Americas Assocs. v. RTC,* 1993 WL 277836 (S.D.N.Y., July 20, 1993) (same).[8]

---

**7.** Plaintiffs also suggest that the re-repudiation was untimely because it was to be effective only if this court ruled in *Franklin I* that the original repudiation was invalid; as my Opinion and Order was issued on October 13, 1992, plaintiffs claim that more than sixty days elapsed between the RTC's appointment as conservator of Franklin Federal and the effectiveness of the re-repudiation. I disagree. As noted in the text, the repudiation of September 1992 was to be effective only *if* this court invalidated the original repudiation, but it was to be effective *when* it occurred, and it occurred on and was communicated to the Trustee within sixty days of the RTC's appointment. It was not untimely.

**8.** I also reject plaintiffs' contention that the RTC here could not validly repudiate the Bonds because Franklin Federal did not possess the entirety of those obligations after the pass-through receivership. Plaintiffs's contention is that because Franklin Federal assumed Federal's liabilities, including the Bonds, only up to "the fair market value of assets securing such liability," and because this would not include the obligation to pay the Bonds in full at maturity *if* the Bonds were to become undersecured, Franklin Federal did not assume the entire obligation of the Bonds and therefore could not repudiate such an obligation. This arcane and contrived argument is unconvincing. The fact is that Franklin Federal repudiated its obligation under the Indenture. That obligation included the entire obligation represented by the Bonds, for there is no suggestion that the Bonds were undersecured at the time of the first repudiation or when the RTC again repudiated the Bonds in September 1992. The RTC has adequately shown that the obligations at issue were passed from Franklin to Franklin Federal under the P & A Agreement, and the RTC as conservator for Franklin Federal could therefore repudiate the Bonds.

(ii) *Whether the required determinations were made.* Plaintiffs also argue that the September 1992 repudiation was invalid because William Roelle, then the RTC's Senior Vice President and Chief Financial Officer and the RTC official who made the repudiation decision, never made the determinations required by the statute. *See* 12 U.S.C. § 1821(e)(1)(B), (C). Although Roelle is the same individual who made the June 1990 repudiation decision that was challenged in *Franklin I* and that I found invalid in my October 13, 1992 Opinion and Order, there is no suggestion that Roelle did not possess repudiation authority in September 1992. The RTC's delegations of authority then in effect provided for Roelle to repudiate any contract with the concurrence of the Senior Vice President and General Counsel of the RTC. That official, Aboussie, was at the September 11, 1992 meeting with Roelle and concurred with Roelle's repudiation decision.

■ Plaintiffs contend the Roelle could not possibly have made the two required determinations—that the Bonds were "burdensome" and that the repudiation of them would "promote the orderly administration of the institution's affairs." § 1821(e)(1)(B), (C). The plaintiffs' central point is that because the September 1992 repudiation was conditional, so that it would only be effective in the event this court invalidated the original repudiation, and because market interest rates might change by the time this court's decision was issued, Roelle could not have rationally made the determination that the Bonds would be burdensome without knowing what long-term interest rates would be at the time the repudiation would become effective. The argument is misconceived. The September 1992 repudiation was only to be effective *if* the courts invalidated the earlier repudiation, but the re-repudiation, if effective, would be effective as of the date it occurred. Roelle was therefore entirely capable of determining that the Bonds were burdensome as of the date of his decision, and the evidence shows that he adequately made that determination.

■ Plaintiffs' further challenges to the re-repudiation decision are without merit. The RTC has made a strong showing that its

official did what the statute requires. And the statute itself explicitly delegates the required determinations to the RTC in its "discretion." The relevant issue is not whether the RTC official considered everything possible in making these determinations or even whether he reached the "right" decision; the question is whether he made the determinations required. Even if the determinations were based on incorrect perceptions of fact or incorrect assumptions about the governing law, the RTC has broad discretion to make the determinations and to effectuate repudiation. I conclude that the RTC acted lawfully and within its discretion in repudiating the Bonds on behalf of Franklin Federal in September 1992.

B. *The October 1992 ratification.* Because I conclude that the RTC validly repudiated the Bonds and the Indenture in September 1992, I need not reach the questions whether the October 1992 ratification of the June 1990 repudiation might also have validly repudiated the Bonds. Furthermore, I need not determine whether the defeasance process begun on October 21, 1992, might have vested any rights of the Bondholders prior to the ratification.

■ In any event, the validity of the September 1992 re-repudiation provides a simple reason why the ratification in October could not effectively validate the original repudiation. On September 14, 1992, the RTC repudiated the Bonds "effective ... only in the event that the District Court determines that the RTC's original repudiation decision was made without following the appropriate procedures." On October 21, 1992, judgment was entered declaring the original repudiation void. At that point, at the latest, the conditional re-repudiation of September 1992 became effective and the Bonds and Indenture ceased to exist as a contract of Franklin Federal. Therefore, on October 22, 1992, when the RTC purported to ratify the original repudiation, there was nothing left to repudiate. The original repudiation could not be resuscitated. Of course, for a principal to ratify the unlawful act of an agent, the principal must itself be able, at the time of ratification, to perform the original act. *E.g., Cook v. Tullis,* 85 U.S. (18 Wall.) 332, 338, 21

L.Ed. 933 (1874) ("it is essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, but also at the time the ratification was made"); *see Restatement (Second) of Agency* § 86(1) (1958).[9] Here, there was no act left for the principal to perform.

### 3. *Repudiation of "non-executory contracts".*

Plaintiffs argue that the RTC may not repudiate "non-executory contracts" and that, because the Bondholders had fully performed their contractual obligations, the Indenture was such a contract. Plaintiffs point to several opinions questioning whether § 1821(e) allows a receiver to repudiate a contract where the non-bankrupt party has fully performed, *see Marsa v. Metrobank for Savings, F.S.B.*, 825 F.Supp. 658, 666 (D.N.J. 1993); *Fresca v. FDIC*, 818 F.Supp. 664, 666 (S.D.N.Y.1993), and to one recent decision holding that § 1821(e) gives no such power, *see LaMagna v. FDIC*, 828 F.Supp. 1, 2 (D.D.C.1993). The statute, however, explicitly provides that the RTC as conservator or receiver "may disaffirm or repudiate *any* contract or lease" "to which the institution is a party." § 1821(e)(1)(A) (emphasis added). It thus contrasts markedly with the Bankruptcy Code, which gives a trustee in bankruptcy the power to "assume or reject any *executory* contract or unexpired lease of the debtor." 11 U.S.C. § 365(a) (emphasis added). Congress provided no such limitation here. *See Morton v. Arlington Heights Federal Savings and Loan Ass'n*, 836 F.Supp. 477 (N.D.Ill.1993).[10] And, so long as the RTC pays appropriate damages (discussed below) when it repudiates, as the statute requires, the statute's provision allowing the RTC to repudiate non-executory contracts is neither unjust nor unconstitutional. I therefore need not decide whether the Indenture was an "executory" or "non-executory" contract for I conclude that the RTC could repudiate the Bonds even if they were "non-executory."

### 4. *The Prohibition on the Avoidance of Security Interests: § 1821(e)(11).*

Plaintiffs next contend that repudiation of these Bonds violates § 1821(e)(11), which, as noted, provides that "[n]o provision" of § 1821(e) "shall be construed as permitting the avoidance of any legally enforceable or perfected security interest in any of the assets of any depository institution." Plaintiffs argue that the RTC's repudiation would prevent the Indenture Trustee from performing the defeasance in accordance with the security provision of the Indenture and would therefore constitute an illegal "avoidance of [a] . . . perfected security interest." Because the security provisions are written in a manner that goes beyond simply giving the Bondholders a security interest in specified assets and places an affirmative duty on the Trustee in certain circumstances to take actions for the protection of the Bondholders that would be prevented by repudiation, the Bondholders contend that, in this case, the act of repudiation "avoids" the security interest and is therefore forbidden.

I do not understand the statute to mean what the Bondholders suggest. If this were the meaning of § 1823(e)(11), the RTC's ability to repudiate could be defeated in each instance simply by drafting security agreements in a manner that placed affirmative duties on the Trustee that would not be compatible with a repudiation. The reading offered by the RTC (and set out in the RTC's

---

9. I do not rule on whether the RTC could ratify a decision to repudiate the Bonds at a time when those obligations had already passed to an entity other than the institution on behalf of which the RTC had performed the original repudiation. .

10. The *Morton* court pointed out that, While it would clearly be unjust (and perhaps unconstitutional) to permit an institution in receivership to walk away from a contract that had been fully performed on the other side, the provision for a damage remedy largely elimi-

nates that concern. . . . [The parallels between FIRREA and the Bankruptcy Code do] not require us to add a limitation to FIRREA that is not there. Congress certainly had the bankruptcy model in mind, and it appears reasonable that Congress, well aware of the reference to executory contracts in the Bankruptcy Code, deliberately omitted it in FIRREA in order to avoid disputes over whether a given contract was executory.

836 F.Supp. at 481–82.

April 10, 1990 Policy Statement) [11] effectively rebuts the Bondholders' argument. Under § 1821(e)(1), the RTC may repudiate "any" contract if burdensome, whether secured or not. The RTC may not, however, deprive a secured party of its security interest. § 1821(e)(11). It must pay actual compensatory damages for injury caused by repudiation, and must afford the secured party the benefit of the security interest for the satisfaction of the payment of such damages. Section 1821(e)(11), then, forbids the RTC from treating a secured party as if it were unsecured. It does not follow that, because of the existence of the security interest, the RTC is barred from repudiating a burdensome contract when the right to repudiate is expressly granted to the RTC by the statute. *See Unisys Finance Corp. v. RTC*, 979 F.2d 609, 611 (7th Cir.1992) (§ 1821(e)(11) only guarantees that secured party receives full value of its valid claim, up to the value of the collateral); *LB Credit Corp. v. RTC*, 796 F.Supp. 358, 361 (N.D.Ill.1992) ("Section 1821(e)(11) protects a creditor's security interest, but only to the extent a creditor has a claim under FIRREA.").[12]

■ Hence, an unsecured party with a valid claim for damages under § 1821(e)(3) may receive a pro-rated portion of the claim if the institution's assets are insufficient to pay all claims in full, while a fully secured party will receive the entire value of its claim.[13] The question, then, is: what is the value of the Bondholders' claim under § 1821(e)(3)? For if their claim is fully secured (and the terms of the Indenture appear to guarantee that it is), § 1821(e)(11) provides that the Bondholders must receive the full value of their claim.

5. *Damages to which the Bondholders are entitled.*

"By repudiating the contract the receiver is freed from having to comply with the contract, but the repudiation is treated as a breach of contract that gives rise to an ordinary contract claim for damages, if any." *Howell v. FDIC*, 986 F.2d 569, 571 (1st Cir. 1993) (citation omitted). As noted above, FIRREA provides that the remedy for repudiation shall be the "actual direct compensatory damages," § 1821(e)(3)(A)(i), and specifies that actual direct compensatory damages "does not include (i) punitive or exemplary damages; (ii) damages for lost profits or opportunity; or (iii) damages for pain and suffering." § 1821(e)(3)(B). The parties contend that substantially different measures satisfy the statutory formula.

■ The RTC rather slides by the part of the statute that refers to "actual direct com-

11. The Statement of Policy provides:
Reading these statutory provisions as a whole, it is clear that even secured contracts may be repudiated; that damages are limited to the extent set forth in the statute; and that legally enforceable or perfected security agreements are to be honored to the extent of such damages but no further or otherwise. In other words, if there is a repudiation, the collateral securing a contract may be liquidated and the proceeds paid to or retained by the creditor up to the damages allowed by the statute, i.e., damages for actual direct compensatory losses measured as of the date of the appointment of the conservator or receiver. The remaining collateral or proceeds must then be remitted or returned to the conservator or receiver as property of the savings association or its estate or to a bona fide junior lienholder to the extent applicable.
Even if the statute were ambiguous on this point, which I do not believe it is, I would defer to the RTC's permissible interpretation. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

12. This interpretation of §§ 1821(e)(3) and 1821(e)(11) is consistent with the powers of bankruptcy trustees, who may repudiate secured leases but may not affect the creditor's secured status. *See, e.g., Leasing Service Corp. v. First Tennessee Bank National Ass'n*, 826 F.2d 434, 437 (6th Cir.1987) (upholding bankruptcy trustee's rejection of a secured equipment lease: "rejection or assumption of an executory contract determines only the status of the creditor's claim, i.e., whether it is merely a pre-petition obligation of the debtor or is entitled to priority as an expense of administration of the estate. The extent to which a claim is secured is wholly unaffected"); *In re CM Systems, Inc.*, 87 B.R. 707 (Bankr.M.D.Fla.1988) ("rejection of a lease does not change lessor's status from secured to unsecured").

13. As noted below, the existence of security can affect the amount of the bondholders' damages because it affects the market value of their bonds.

pensatory damages," preferring to focus its attention on the clause that bars recovery for "lost profits or opportunity." According to the RTC's argument, this provision means that an award of damages may not include any portion of the value of the Bonds that reflects value resulting from the expectation of future performance. It contends that the correct measure of damages is the "accreted value" of the Bonds. Accreted value is a concept that derives from the initial offering price of the Bonds. The accreted value represents two components: (i) the investment made by the initial purchaser on the date of the initial offering, plus (ii) the accrued interest to the date or repudiation,[14] premised on purchase at the initial offering. To arrive at the accrued interest portion, one takes the original issue discount (the difference between the offering price and the amount to be paid at maturity) representing aggregate interest paid throughout the life of the bond, allocates it through the Bond's 35 to 45 year expected life, and credits the Bondholder with interest attributable to the days expired as of repudiation. Otherwise put, one takes the "yield to maturity" resulting from purchase at the initial offering, and credits the Bondholder with interest at that rate for each day expired up to the date or repudiation. The RTC thus eliminates from the damage remedy any payment relating to the obligation of the bond subsequent to the date of repudiation, considering those to represent "lost profits."

In support of this measure, the RTC points to the provisions of FIRREA that deal with the repudiation of contracts for leases under which the insolvent institution is the lessee. § 1821(e)(4). This section provides that upon repudiation of a lease the RTC will be liable for contractual rent up to the date of repudiation, but not for damages resulting from the lessor's loss of the profits of the rental for future periods. The RTC argues that this provision gives a clue to the understanding of the statutory term that denies damages for "lost profits or opportunity." It argues that a bond can be seen as a lease (by the issuer) of the use of the moneys paid by the purchasers on the initial subscription; the interest represents the rental payment; and the statute evinces an intention that the RTC upon repudiation be liable for the rental payments only for the actually expired days, without obligation to make any payment attributable to the unexpired portion of the contract. In support of this argument, the RTC points to *Lawson v. FDIC*, 3 F.3d 11, 15–16 (1st Cir.1993), in which Judge Boudin made such an analysis where the repudiation had been of an unmatured one year bank deposit.[15]

14. Both parties have litigated this issue on the assumption that the *proper date for valuation of* the Bondholders' "actual direct compensatory damages" is the date of the RTC's valid repudiation of the Bonds. I accordingly also use that date, although I note that the literal terms of the statute call for evaluation of damages "determined as of ... the date of the appointment of the conservator or receiver" (or, in the case of qualified financial contracts, "the date of the disaffirmance or repudiation of such contract or agreement"). § 1821(e)(3)(A)(ii).

Use of the date of the RTC's appointment is puzzling. (The parties have ignored this provision.) The date of repudiation, which the parties have assumed is appropriate, seems more logical as that is· the date on which the loss is suffered through repudiation. Because the court's function is to decide disputed rather than undisputed issues and because the parties have not disputed the use of the date of repudiation, I will use that date.

(Subsequent to trial and briefing, the Bondholders, in a letter to the court, asked the court to use a later date—the date on which the Bondholders receive payment. In addition to having no statutory authorization and to being inconsistent with the normal convention for the calculation of damages, the Bondholders' suggestion would create a conundrum: Payment does not occur until the court had rendered Judgment dictating the amount to be paid; but the court could not assess the amount to be paid until it had observed the facts that obtained on the date of payment. If the Bondholders were to prevail in this argument, they would have to wait forever to receive their payment.)

15. The RTC also seeks comfort in a statement appearing in the Offering Circular stating that

a receiver for Franklin may liquidate the claims of Bondholders at that time [*i.e.*, receivership] in which case the claim of the holder of a Bond with respect to the principal amount thereof probably will be limited to the Issue Price of the Bond plus the then accreted portion of the Original Issue Discount calculated as specified in the Indenture.

I find the argument misconceived. The writers of an offering prospectus characteristically seek to protect themselves from liability for misleading by presenting unfavorable possibilities.

The Bondholders point to several deficiencies in the RTC's argument: First, while there may indeed exist a plausible analogy between a bond and a lease, a bond is not a lease. The special statutory provision for damages on repudiation of leases obviously does not apply on its own terms to a bond issue. Furthermore, if the general damages provisions of § 1821(e)(3) meant, as the RTC seems to argue, that, in the case of all repudiated long-term contracts, damages would be paid only with respect to the expired portions, there would have been no need for the special provisions of § 1821(e)(4) affecting leases.

In addition, the Bondholders argue that the RTC misconstrues the phrase "lost profits or opportunity." They contend that, taken in light of the common law concept of "lost profits," this phrase in FIRREA is meant to deny damages not for the profits arising out of the performance of the contract, but for remote profits that the plaintiff contends he would have had the opportunity to earn had the contractual promise been performed. They point to cases where such contingent damages have been distinguished from damages flowing directly from the breach, *see Kenford Co. v. County of Erie*, 67 N.Y.2d 257, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234, 235 (1986) (citing cases); *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng.Rep. 145 (1854); *McKinley Allsopp, Inc. v. Jetborne Int'l, Inc.*, 1990 WL 138959 (S.D.N.Y., Sept. 14, 1990), slip op. at 18–19; *see also American List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 550 N.Y.S.2d 590, 593, 549 N.E.2d 1161, 1164 (1989), and contend that damages under § 1821(e)(3) include the latter category. *Cf. American List*, 550 N.Y.S.2d at 593, 549 N.E.2d at 1164 (where plaintiff seeks only monies "which defendant undertook to pay under the contract," such are not lost profits, even if the monies were to be paid in the future).

Further, the Bondholders argue that purchase price of initial offering and the yield-to-maturity anticipated by the initial purchasers have no relevance whatsoever for subsequent purchasers in the secondary markets like themselves. The concept of yield-to-maturity in the bond market has reference only to a particular purchase price on a particular date: One knows from the stated terms of the bond what payments its issuer is required to make and on what dates. For every hypothetical purchase price of such a bond on every different possible date, there can be calculated a yield-to-maturity, which represents the return, expressed as a percentage of the hypothetical investment, that the purchaser would realize on holding the bond to its maturity and receiving each required payment on its due date. This is a most important measuring concept in the bond market because it permits comparison and provides the means of assuring that comparable risks will trade at comparable prices. But yield-to-maturity has significance only prospectively. A prospective purchaser must know the yield-to-maturity to understand the significance of the offering price and to compare it with competing investment opportunities in the money market; the prospective investor has no interest in knowing what was the yield-to-maturity for any prior purchaser. That is of merely historical interest; it plays no role whatever in helping the prospective investor to decide whether to purchase.

Equally irrelevant, the Bondholders argue, is adoption, under the accreted value method, of the purchase price for a prior purchase. If the Government seized a house in condemnation, the owner would not be compensated based on what it had cost some prior owner to build the house, but rather on what the house was worth at the time of the seizure. The Bondholders contend it is absurd (if not unconstitutional) for the RTC to offer them compensation for their repudiated bonds based on what a prior purchaser had paid, regardless of the fact that the Bondholders all bought their Bonds at substantially higher prices by reason of declines in interest rates and regardless of the fact that the Bonds had a market value far in excess of the initial offering price plus accrued interest at the time of repudiation.

The Bondholders argue that a zero coupon bond is a security that represents simply the right to receive a specified sum on a specified date. They therefore contend that "actual direct compensatory damages" would be the present value (as of the date of repudiation)

988

of the right to receive the face amount of the Bonds at maturity. They describe this as the sum necessary to buy U.S. government zero coupon securities in an amount that would yield $2.9 billion at the maturity dates of the Bonds and point out that this sum represents the assets of the defeasance trusts.

In support of this argument the Bondholders point to a different provision of FIR-REA's compensation statute. Section 1821(e)(3)(C) covers the damages to be paid upon the repudiation of a qualified financial contract (QFC), a concept that includes a simple futures contract. *See* § 1821(e)(8)(D). Under this provision, upon repudiation of a futures contract, the RTC would be obligated to pay the cost of "cover", that is the cost of purchasing contract rights to acquire the same commodity on the same date at the same price as provided for by the repudiated contract. Unlike the section covering lease contracts, this provision relating to QFCs does not deny damages attributable to future performance. It accords to the victim of the repudiation the full value of the repudiated contract, notwithstanding that such value depends in part on future prices and on future performance by the issuing institution. A zero coupon bond can be seen as a futures contract: The holder of the bond owns a contractual right to receive a specified amount of a commodity (U.S. Dollars) on a specified date. If such a bond repudiation were to be compensated on the same basis as a futures contract, the award would be precisely what the Bondholders seek. And if one is arguing on the basis of economic analogies, zero coupon bonds are at least as close, if not a good deal closer, to a futures contract as they are to a lease contract. Therefore, the Bondholders argue, the "cover" damages of QFCs are more appropriate here than accreted value, which is comparable to the damages provided for repudiated leases.

▪ In my view, neither the RTC's nor the Bondholders' approach correctly identifies the measure of damages to which the Bondholders are entitled. The inappropriateness of the RTC's position as a measure of "actual direct compensatory damages" is that it has no logical capacity to

measure the Bondholders' loss, and will frequently, as further explained below, result in arbitrary distortions in either direction. An inappropriateness of the Bondholders' proposed measure results from its tendency, in some cases, to overstate the loss by assuming that, but for the repudiation, all zero coupon bonds would be performed in accordance with their terms. To give the repudiated bondholder the present value of the promised sum on the date of maturity assumes that the repudiated bond was certain to be paid. While that assumption may be realistic for these Bonds by reason of their overcollateralization, it is certainly not properly assumed for all zero coupon bonds issued by institutions that later become insolvent. In short, neither the RTC's nor the Bondholders' proposed measure fairly approximates a bondholder's "actual direct compensatory damages."

▪ In my view the correct measure is much simpler, more logical, and more direct than the formulations offered by the parties. These Bonds are marketable securities. They have an easily ascertained market value—a value at which they could be bought or sold at a given time. The market value of the securities of which they were deprived by the RTC's repudiation represents the Bondholders' actual direct compensatory damages. Where the loss is of a security having an ascertainable, immediately realizable, market value, no part of that loss consists of "lost profits or opportunity."

▪ If the repudiated contract were for the sale of a piece of commercial real estate, it seems perfectly clear that the measure of damages for repudiation would be based on the market value of that piece of land, notwithstanding that the market value of commercial real estate depends on nothing other than the expectation of profitable exploitation of that land in the future. The argument made here by the RTC would require that the victim of repudiation receive nothing in damages. The RTC's present argument, as applied to those facts, would contend that, because the entire market value of the land is attributable to the expectation of future profits from exploitation, no part is eligible to be considered "actual direct compensatory

damages" under § 1821(e)(3). The argument is unthinkable.

 If the repudiated contract had required the institution in receivership to deliver ten Franklin Bonds in exchange for services or a payment previously rendered, the actual direct compensatory damages for repudiation would simply be the market value of the ten bonds promised but not delivered. It is unlikely we would accept an argument by the RTC in those circumstances that it should pay only the accreted value calculated on the basis of the original issue price, contending that any excess over the accreted value represents "lost profits." The argument is no more persuasive when made in the context of a repudiation of the entire bond issue. In either case, the holder (or contract obligee) of ten Bonds has suffered actual direct damage in the same amount, being the loss of the market value of the ten Bonds, which, but for the repudiation, he could have sold that day on the bond market at their market value.

 The same can be seen if the repudiated contract were for the delivery of 100 shares of common stock in another company, in exchange for payment previously made. It seems clear beyond question that the actual direct compensatory damages would be the market value of the shares of common stock not delivered. This would be true even though the market value of the common stock might substantially exceed the liquidation value. In such case, the excess of market value over liquidation value would unquestionably be attributable to the market's expectation that the company will have profitable operations in the future, bringing future profit to its shareholders. Yet it would not occur to us in such a case to limit the damages for repudiation to the liquidation value of the undelivered shares by reason of the bar on awards for lost profits.

The illogicality of the RTC's position and the arbitrariness of its proposed measure can be seen from the fact that, while this measure would in some instances unfairly undercompensate the bondholders, in other circumstances it would unfairly overcompensate them. That is because the RTC's measure of damages bears little logical relationship to the compensation of a bondholder's actual loss.

An easily imagined circumstance in which the accreted value measure would overcompensate the bondholders would occur with an oversecured bond where interest rates had risen substantially since issuance, causing its market value to decline. The accreted value of the bond would then substantially exceed market value. If the bond were repudiated and if accreted value measured their damages, bondholders would realize a windfall at the expense of the RTC. (It is, of course, less likely where the original yield to maturity interest rate is below market that the RTC would consider this bond burdensome and cause its repudiation, but the burdensomeness might well result from overcollateralization, as in the case of these bonds, denying the RTC access to important collateral, or from other onerous obligations of the indenture.)

The illogicality of the accreted value method to value the Bondholders' loss is also well illustrated by applying it to nonsecured zero coupon bonds. If such a bond had lived out the major part of its life-to-maturity at the time of repudiation, the accreted value might well be $0.70 per $1.00 of face value. At the same time, the perceived insolvency of the issuing institution might cause the marketplace to value its bonds at only a tiny fraction of their maturity value—let us say $0.10 per $1.00. The accreted value would be of no economic significance to the bondholder. The significant fact in evaluating his loss by reason of the repudiation would be that he had effectively lost a security worth only ten cents for each dollar of face value. This bondholder should not have his damages valued at seven times his loss because of metaphysical arguments concerning the accrual of interest on the original purchaser's investment.

As the above example suggests, a shortcoming of the RTC's valuation method is that it defeats an important part of the Bondholders security, by treating secured and unsecured bonds identically for purposes of valuation of the loss. The actual damages resulting from the accreted value method is the

same for these virtually risk free, overcollateralized obligations as it would be for practically worthless bonds of a bankrupt and assetless institution. This ignores an important aspect of the function of security for an obligation. The collateral securing the Bonds not only assures that the Bondholders will be paid their due at maturity (or upon default); it also, as a consequence of that assurance, importantly affects the market value of Bonds during their long life. At the time of the RTC's appointment as receiver for the failing institution, there would have been an enormous difference between the market values of these well-secured Bonds and another issue of Franklin bonds, comparable in every detail except without security. Thus the repudiation inflicted on these Bondholders a far greater loss than it would have inflicted on the holders of the hypothetical unsecured series. All this additional loss is ignored by the RTC's method. In response, the RTC argues that the sole function of security is to insure payment of what is due; it does not affect the amount that is due. In so arguing, the RTC essentially mischaracterizes the Bondholders' situation, ignoring that they are the holders of marketable securities and attempting to characterize them as if they were contractors, engaged in long-term contractual dealings with Franklin—for cleaning, or elevator repair, or the lease of computers to the bank over a long term. *See Unisys Finance Corp. v. RTC,* 979 F.2d 609 (7th Cir.1992) (computer lease).[16] This distorts the nature of the Bondholders' property lost through the repudiation.[17]

I recognize that the RTC's Policy Statement of April 10, 1990, in which it adopted the accreted value method, did not purport to cover *unsecured* zero coupon bonds. And of course, where the bond is unsecured it is less likely that the RTC would wish to repudiate it, because of the fact that zero coupon bonds place little burden on the issuing institution until maturity. Nonetheless, the RTC has acknowledged (*see* Letter Brief of December 16, 1993)[18] that the same accreted value method would apply to repudiation of unsecured zero coupon obligations. Furthermore, such bonds could well be burdensome, either because of other restrictions imposed by the terms of the indenture or because a desirable transfer of the assets and obligations of the failed institution to another institution might require repudiation of the zero coupon obligation as a precondition. The point, in any event, is unaffected by whether the RTC purported to cover unsecured zero coupon bonds, or whether it is likely to wish to repudiate such issues. The point illustrated is that the accreted value method is not a fair or logical or even sensible method of valuing the bondholders "actual direct compensatory damages," as § 1821(e)(3) requires. It is a biased method, producing distortion that would unfairly fail to compensate bondholders for their loss in some circumstances and unfairly overcompensate them in others. This is of little concern to the RTC because it is at the controls, choosing to utilize this distorting method in those instances when its unfairness will redound to the RTC's favor and avoiding it, either by not repudiating or by adopting a different measure, where its use would prejudice the RTC.

I therefore conclude that the statutory measure of damages in the case of the repudiation of a publicly traded bond of this nature is the market value of the repudiated security, and that the statutory provision denying recovery of "lost profits" does not justify limiting damages to accreted value based on the initial purchase price, a concept that has no meaningful relationship to the loss suffered by the Bondholder (especially, one who purchased in the secondary markets). I note in further support of this holding that,

---

**16.** The RTC contends that my conclusion requires disagreement with Judge Posner's opinion in *Unisys*. This is not correct. Judge Posner's opinion relates to the securing of a different type of contractual arrangement (for which FIRREA specifies the applicable damages).

**17.** This capacity of the RTC's valuation method to destroy an important aspect of the function of the security raises a serious question whether it is compatible, as applied to secured bonds, with § 1821(e)(11)'s prohibition of the "avoidance" of security interests.

**18.** "The fact is that the amount of the Bondholders' claim would be same whether or not the Bond Agreements were secured." RTC Letter Brief, December 16, 1993, at 1.

while the Bankruptcy Code expressly denies creditors' claims for "unmatured interest." 11 U.S.C. § 502(b)(2); *see In re Chateaugay*, 109 B.R. 51, 54–57 (Bankr.S.D.N.Y.1990), *aff'd*, 130 B.R. 403 (S.D.N.Y.1991), *aff'd in part and rev'd in part*, 961 F.2d 378 (2d Cir.1992), FIRREA adopted no such restriction.

■■■■ While many aspects of the various provisions of FIRREA are unclear, one aspect that appears clear is that where the repudiation consists of a deprivation of a security that is traded on a market, the actual direct compensatory loss is the loss of the value of that security. I recognize that the RTC is an agency authorized to administer the provisions of FIRREA at issue, and that therefore, as noted above, its permissible construction of an ambiguous statute is entitled to deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 439, 106 S.Ct. 1931, 1938–39, 90 L.Ed.2d 428 (1986) (deferring to FDIC interpretation); *Arkansas State Bank Commissioner v. RTC*, 911 F.2d 161, 165–70 (8th Cir.1990) (deferring to RTC regulation interpreting statute). However, the agency's discretion to interpret a statute is not unbounded, and in fashioning the accreted value as the appropriate measure of damages for publicly traded zero coupon bonds, the RTC, seeking to serve its own financial interests, has chosen a method that so clearly deviates from the statutory command and is so evidently arbitrary and not susceptible to uniform fair administration that I find it is beyond the RTC's discretionary power. *See Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82 ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."). (Moreover, were the RTC interpretation of the statute a permissible one, such would raise constitutional issues concerning whether it resulted in an unconstitutional taking.)

The RTC objects that this decision is incompatible with the First Circuit's analysis in *Lawson v. FDIC*, 3 F.3d 11 (1st Cir.1993). I disagree. *Lawson*, as noted above, involved the RTC's repudiation, not of a long-term bond, but of a one-year term deposit in a bank. The First Circuit, drawing an analogy to a lease, ruled that the prohibition of § 1821(e)(3) required denying compensation to the deposit holder for the loss of the investment for the unexpired portion of the deposit term. The court wrote that "[t]he barring of above-market interest for the period after the money has been returned to the depositor is surely what Congress had in mind when it barred lost profits of opportunities." 3 F.2d at 16.

Although I do not disagree with the First Circuit's analysis *as applied to a one-year time deposit*, I believe this conclusion is less clearly evident than the *Lawson* opinion suggests. The statute's words denying damages for "lost profits or opportunity" are very poorly chosen to communicate the instruction that the profit to be derived from contractual rates will be awarded for the time up to repudiation but not for any further duration of the contract period. Also, while the First Circuit noted the analogy between long-term deposits and leases (which favors the RTC's position), it did not advert to the equally valid analogy to futures contracts for which the FIRREA statute gives full profits, notwithstanding that they are to be earned in the future, a point apparently not argued to the court in *Lawson*.

■■■■ Accepting nonetheless the correctness of the First Circuit's conclusion *for one year deposits*, I note that there are important distinctions between a one-year deposit and 40–year bonds that affect the issue of compensatory damages upon repudiation.

■■■■ Generally speaking, time deposits are not negotiable, much less securities traded in the public markets. Furthermore, because each time deposit has a unique maturity date, different deposits of the same institution, even in the same amount, are not fungible. There is no market for them.[19]

---

**19.** In a few relatively rare cases, the largest banks have underwritten offerings of certificates

in uniform series, in the manner of corporate commercial paper, making such certificates mar-

The relationship between the institution and the creditor is completely different as between a deposit and a bond. In the case of the deposit, it is in the nature of a two-sided fixed term contractual arrangement. The depositor's relationship is solely with the bank. He establishes his deposit by a transaction with the bank, closes it through the bank's return of the deposit to him, and generally has no anticipation of any other transaction relating to that deposit. The deposit holder, unlike a bondholder, furthermore, is capable of cancelling the contractual relationship between himself and the bank (although generally at the cost of a penalty).

The bondholder's relationship with the issuer of the bond is completely different. Most holders of long-term bonds never have a transaction with the issuer. They cannot cancel the obligation by early redemption of the Bond. On the other hand, they can sell it. They buy and sell bonds on the bond markets. The operation of the bond market produces at all times quoted bids and offers that establish the value of a bond. Many investors purchase and sell long-term bonds in the marketplace as speculations in long-term interest rates. As rates fall, the market values of bonds rise, and vice versa. Fund managers who maintain bond portfolio must maintain daily portfolio valuations recording daily changes in the quoted market values of the bonds in their portfolio.

Bank time deposits are valued quite differently. There is no market from which to derive a quoted value. Valuations would be based on some estimate of the present value of the instrument, derived from either the accreted value, or the redemption value, or the present value of the right to receive the promised future payment.

Furthermore because of the enormous differences in term between a one year deposit and a 40 year bond, changes in prevailing rates of interest have enormously different effects on their value. Because a one year deposit is always less than one year from payment of its face amount, even wide fluctuations in interest rates—say between 5 and 10%—would affect its present value by less than 5%. In contrast, such a change in interest rates affecting long-term bonds will cause close to a 50% drop or 100% increase in market values. The Lawson's one year deposits bore interest at 7.9%; the repudiation of the deposit in its second month by the FDIC resulted in the Lawsons being offered a lesser (unspecified) rate for the ten months remaining in the year. Assuming the rate they were offered to have been in the neighborhood of 6%, the adverse effect on the Lawsons amounted to less than two percent of the funds in question. This modest loss justified the court's observation that a function of FIRREA was "to spread the pain" resulting from bank insolvencies. *Lawson*, 3 F.3d at 16. Here in contrast, the RTC's proposal to award the Bondholder's accreted value as the measure of their damages, rather than the market value of the security they lost, would result in giving them approximately 50% of the market value of their Bonds.[20]

Notwithstanding economic similarity between a term deposit and a bond, the differences between the *Lawson* case and this are so enormous as to require a different treatment under the statute. The repudiation deprived the Bondholders of a marketable security with a market value that could have been realized by a sale on the date in question. A Bondholder who purchased Bonds just prior to the RTC's appointment as receiver would have had to pay the full market

ketable securities. There is no suggestion that the deposits in *Lawson* were of such nature.

20. A further justification for the First Circuit holding—and for my conclusion here—is that to treat the Lawsons as if their deposits were worth their full face value at the time of maturity would be to ignore that the Lawsons had made their contract with what became an insolvent institution which would not be able to perform fully its contractual obligation. Had the Lawsons deposits been in the nature of marketable securities,

the market would surely have reflected the Maine Savings Bank's inability to make good its obligations. The actual compensatory damages suffered by the Lawsons through the loss of such a security would have been substantially lower than even the limited award found by the FDIC. In contrast, the Franklin Bondholders had a fully secured investment whose market value was sustained by the collateral, independent of the financial health of the obligor.

price to acquire the Bonds. To then compensate the Bondholders by paying just over half of the market value, on the explanation that the remaining portion of the present market value really consisted of "lost profits" does not seem a permissible reading of the statute.[21]

### 6. How to determine fair market value.

■ Although in the ordinary case the determination of the market value of the repudiated bonds as the measure of compensatory loss would be easily established by reference to market trading reports, here we encounter an unusual difficulty. Because the RTC announced in its April 10, 1990 Policy Statement that it would pay only accreted value when repudiating secured zero coupon bonds, the investing community apparently took this warning seriously, with the consequence that the value of the bonds dropped far below what the market price would otherwise have been. If the damage remedy necessary to settle the dispute between the parties is to be settled by reference to the fair market value of some good or piece of property, it is not permissible for one of the parties to take actions that will affect the market value in a manner that favors the actor and disfavors the adversary. Where this has happened the market value becomes a manipulated value and no longer fairly reflects what it was thought to measure.

■ Although the RTC did not issue its April 10 statement *for the purpose* of influencing the market for the Bonds, the statement nonetheless had that effect. Bidders for the Bonds anticipated that they would be paid at accreted value upon repudiation and were therefore unwilling to bid more than accreted value. The market values accordingly plummeted and no longer represented the market's free appraisal of the value of those securities. The market quotation thus cannot fairly be used to indicate *fair* market value.

■ This difficulty is easily overcome, however. It should be easy to determine by the testimony of experts in the bond markets what was the fair market value of the Bonds on the date in question. Generally speaking, the market value of bonds depends primarily on two factors: the likelihood that the payment obligations of the bonds will be performed in accordance with their terms (that is, the market's assessment of the credit risk) and the yields available to investors on similar instruments with similar maturities. Because the Franklin Bonds were extraordinarily well-secured by U.S. government-backed obligations and therefore exposed the investor to little risk of nonpayment, their market value would depend almost entirely on the second factor. That is, fluctuations in their value would have been primarily attributable to long-term interest rate movements. Under these circumstances it can be expected that experts in the bond markets would have little difficulty offering opinions as to what the fair market value of the Bonds would have been had it not been influenced by the RTC's statements that upon repudiation it would pay no more than accreted value. The parties will be invited to submit affidavits containing such expert testimony and will be permitted to cross examine each other's experts by deposition.

### Conclusion

I conclude that: (1) the RTC validly repudiated the Franklin Bonds and Indenture when it re-repudiated on September 14, 1992; (2) under FIRREA, the RTC must pay to the Bondholders the fair market value of the repudiated Bonds, as of the date of the re-repudiation. Accordingly, the RTC's counterclaims are granted, insofar as they seek a declaratory judgment that (a) the Bondhold-

---

21. Another important difference between *Lawson* and this case relates to the RTC's point that the repudiation provisions of FIRREA were designed to defeat "sweetheart contracts" that might be let by institutions on the brink of insolvency. The First Circuit noted in *Lawson* that the failing Maine Savings Bank had lured the Lawsons' deposits by offering a "favorable" interest rate, which is what led the FDIC to repudiate those deposits only weeks after they had been created. 3 F.2d at 12. In contrast, there is no suggestion that the Franklin Bonds were a sweetheart deal or that they were issued at anything other than market rates. The problem for the RTC here was simply that interest rates had declined since issuance, meaning that the Bondholders had made a good investment, or so they thought.

ers have no right to demand distribution of the funds in the defeasance trusts, (b) the RTC validly repudiated the Bonds in September 1992, entitling the Bondholders to damages under 12 U.S.C. § 1821(e)(3). The RTC's counterclaim seeking declaratory judgment that the proper measure of damages is accreted value is denied. The appropriate damages are to be determined in accordance with this opinion.

The parties are directed to serve their expert affidavits, pertaining to market value on the date of repudiation, by January 11, 1994. The experts may be deposed during the following two weeks, the evidence to be submitted to the court on February 8, 1994.

SO ORDERED.